JOHN BOWERS, et al., Plaintiffs,

v.

ANDREW WEIR SHIPPING, LTD., et al., Defendants.

ANDREW WEIR SHIPPING, LTD., et al., Plaintiffs,

v.

NEW YORK SHIPPING ASSOCIATION—INTERNATIONAL LONGSHOREMAN'S ASSOCIATION PENSION TRUST FUND, et al., Defendants.

Nos. 92 Civ. 3728 (PKL), 92 Civ. 3781 (PKL).

United States District Court, S.D. New York.

Dec. 7, 1992.

**524**

Thomas A. Gleason, New York City (Maura R. Cahill, Ernest L. Mathews, Jr., of counsel), for the NYSA–ILA Pension Trust Fund and the Bd. of Trustees.

Maddy, Dalton & Lion, New York City (Walter H. Lion, of counsel), for Andrew Weir Shipping, Ltd., et al.

## OPINION AND ORDER

LEISURE, District Judge.

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). 29 U.S.C. §§ 1001–1461. The New York Shipping Association–International Longshoreman's Association Pension Trust Fund (the "Fund"), plaintiff in the action numbered 92 Civ. 3728 (PKL), seeks to confirm and enforce an arbitra-

tor's award holding Andrew Weir Shipping, Ltd. ("Weir Shipping") and South African Marine Corp., Ltd. ("Safmarine") liable for withdrawal obligations pursuant to 29 U.S.C. § 1381(a).[1] Weir Shipping and Safmarine, plaintiffs in the action numbered 92 Civ. 3781 (PKL),[2] seek to vacate the arbitrator's award, and further move for summary judgment on the liability issue. For the following reasons, the arbitrator's award is confirmed, and the motions of Weir Shipping and Safmarine to vacate the award and for summary judgment hereby are denied.

## BACKGROUND

The Fund is a multiemployer pension fund established by collective bargaining between the New York Shipping Association and the International Longshoreman's Association to provide retirement benefits to longshore workers in the Port of New York. Bank Line and Safmarine are separately owned and controlled companies that were engaged in steamship carrier operations serving the Port of New York until 1988, when they formed a joint venture that, the Fund contends, resulted in a withdrawal from the Fund. Both companies were contributors to the Fund.

Bank Line was a wholly-owned subsidiary of Andrew Weir & Co., Ltd. ("Andrew Weir Group").[3] In 1980, a separate, unincorporated division within Bank Line began operating a cargo service between the East Coast of the United States, including the Port of New York, and points in South and East Africa. Safmarine, a wholly-owned subsidiary of Safmarine and Rennies Holdings Limited ("Safren Group"), similarly

1. "Withdrawal liability" refers to the amount owed to a pension plan by an employer that terminates or reduces its contributions to the plan. *Banner Indus., Inc. v. Central States, Southeast & Southwest Areas Pension Fund,* 657 F.Supp. 875, 876 n. 1 (N.D.Ill.1987), *aff'd,* 875 F.2d 1285 (7th Cir.1989). The withdrawal liability is the allocable share of unfunded vested benefits at the time of the employer's withdrawal, subject to certain adjustments. *See* 29 U.S.C. §§ 1381, 1391.

2. In accordance with Rule 15 of the Local Rules for Division of Business Among District Judges, the action numbered 92 Civ. 3781 (PKL) was

accepted by the Court as a related case. The parties agreed to consolidate the actions and file consecutively their respective motions for confirmation and vacatur.

3. Subsequent to the events at issue in these actions, Bank Line was consolidated with other subsidiaries of the Andrew Weir Group into a new company named Andrew Weir Shipping Limited ("Weir Shipping"). Weir Shipping, as Bank Line's corporate successor, is the party in this action representing the interests of the Andrew Weir Group.

had a separate, unincorporated division that engaged in cargo trade between the United States and South Africa. Rather than maintaining their own marine terminal facilities in New York, Bank Line and Safmarine contracted with other companies to provide these services. During the period they operated in New York, Bank Line and Safmarine both were members of the New York Shipping Association ("NYSA"), which acts as a multiemployer bargaining association on behalf of its members. NYSA negotiates and administers collective bargaining agreements with the International Longshoreman's Association ("ILA"), the collective bargaining representative for longshore workers employed in the Port of New York.

As NYSA members, Bank Line and Safmarine were covered by NYSA's bargaining agreement with ILA. The contract requires steamship carriers to pay NYSA assessments for employee benefits, based on total tonnage loaded and unloaded from the carrier's vessels by longshoremen in the Port of New York. NYSA passed along portions of these assessments to the Fund. Bank Line and Safmarine continued to pay assessments to the Fund until 1988.

On November 30, 1987, Safmarine and Bank Line entered into a joint venture agreement establishing Safbank as a company operating ships between South Africa and the United States. As part of the agreement, both Bank Line and Safmarine agreed to withdraw from the trade served by Safbank. Safmarine owns a 45% interest in Safbank. The remaining 55% is owned by Comeric Limited, a corporation that is 63% owned by Bank Line and 37% owned, albeit indirectly, by Safmarine. As a result of this structure, the Andrew Weir Group has voting control of Safbank, while profits are distributed 65% to the Safren Group and 35% to the Andrew Weir Group. Safbank assumed the goodwill, reputations, and customer relationships of Bank Line and Safmarine. Safbank became bound by the collective bargaining agreement be-

tween NYSA and ILA by retaining a NYSA agent member as its general agent.

By letters dated November 8, 1989, the Fund advised Bank Line and Safmarine that it had received notice of their cessation of operations in the Port of New York and calculated the withdrawal liability incurred to be $1,404,752 for Safmarine and $252,181 for Bank Line. Upon reconsideration pursuant to the joint request of Bank Line and Safmarine, the Fund reaffirmed its determination. Safbank, Weir Shipping, and Safmarine timely commenced an arbitration, as required by 29 U.S.C. § 1401(b). In the arbitration, Bank Line and Safmarine contended only that no withdrawals from the Fund occurred on their part due to the application of 29 U.S.C. § 1398(1) of the MPPAA.[4] They presented four sub-issues to the arbitrator for resolution:

(1) who are the relevant pre–1988 employers; (2) did they cease to exist as employers for purposes of MPPAA upon the transfer of operations to Safbank in 1988; (3) was the resulting entity a change in corporate structure as envisioned by Section 4218(1) [29 U.S.C. § 1398(1)]; and (4) was there an interruption in contributions or the obligations to contribute to the Fund?

*See* Complaint, 92 Civ. 3728 (PKL), Ex. 1, Arbitrator's Findings, Opinion and Award (the "Award"), at 13. The arbitrator rendered the Award on April 27, 1992. He determined that the controlled groups of Bank Line and Safmarine, rather than the individual companies, were the statutory "employers" and the formation of Safbank was not a corporate change of the type contemplated by 29 U.S.C. §§ 1398(1) and 1369(b). Thus, the arbitrator determined that Bank Line and Safmarine were liable to the Fund for withdrawal obligations.

The Fund, by its Trustees, filed the action in 92 Civ. 3728 (PKL) to confirm and enforce the Award. The plaintiffs in 92 Civ. 3781 (PKL) timely commenced an action to vacate the arbitration award, pursuant to 29 U.S.C. § 1401(b), asserting that

---

**4.** Although they argued to the Fund that the transaction was exempt from withdrawal liability under the sale of assets provision of section

1384 of the MPPAA, Bank Line and Safmarine did not present that issue to the arbitrator.

the arbitrator's conclusions of law were incorrect because:

(1) transfer of the covered operations to Safbank was not a withdrawal due to the § 1398 exemption, since Safbank was formed by a reorganization of its parent groups, has an ongoing obligation to contribute, and continued contributions for the covered operations; (2) the award is inequitable because the withdrawal penalties from Weir Shipping and Safmarine are a double payment, with the Fund still collecting substantially the same assessments from the same operations carried on by the Joint Venture; and (3) *Korea Shipping* is no longer good law in view of *Darden;* Bank Line and Safmarine were not "employers" subject to statutory withdrawal liability.

*See* Weir Shipping Memorandum of Law at 8. Bank Line and Safmarine also argue that they should be exempted from withdrawal liability for this transaction pursuant to section 1384 of the MPPAA, which provides an exemption for certain sales of assets.

## DISCUSSION

### A. *Standard of Review*

■ An arbitrator's decisions on matters of law in an MPPAA withdrawal dispute are subject to full review by the district court. *See, e.g., Trustees of Colorado Pipe Indus. Pension Trust v. Howard Elec. & Mechanical, Inc.,* 909 F.2d 1379, 1386 (10th Cir.1990); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 211 (7th Cir.1989), *cert. denied,* 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989); *Union Asphalts and Roadoils, Inc. v. Mo–Kan Teamsters Pension Fund,* 857 F.2d 1230, 1233–34 (8th Cir.1988), *cert. denied,* 490 U.S. 1022, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989); *Trustees of Amalgamated Ins. Fund v. Geltman Indus., Inc.,* 784 F.2d 926, 928–29 (9th Cir.1986), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 727 F.2d 1204, 1207 n. 7 (D.C.Cir.1984). The parties agree that there are no disputed issues of fact.

### B. *Applicability of the Corporate Reorganization Provision*

■ Section 1398 of the MPPAA provides an exemption from withdrawal liability under certain circumstances:

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—

(1) an employer ceases to exist by reason of—

(A) a change in corporate structure described in section 4069(b) [29 U.S.C. § 1369(b)].

29 U.S.C. § 1398. Section 1369(b) describes certain particular changes in corporate structure that are exempted from withdrawal liability:

(1) Change of identity form, etc. If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.

(2) Liquidation into parent corporation. If a person ceases to exist by reason of liquidation into a parent corporation, the parent corporation shall be treated as the person to whom this subtitle applies.

(3) Merger, consolidation, or division. If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.

29 U.S.C. § 1369(b). Bank Line and Safmarine challenge the arbitrator's determination that the section 1398 exemption for certain corporate changes did not apply to the formation of the Safbank joint venture.

The arbitrator found that the relevant "employers" for purposes of section 1398 were the controlled groups of Bank Line and Safmarine. Award at 20. Further, he determined that the "employers" had effectively "cease[d] to exist" within the meaning of that section. Award at 22. The arbitrator's focus, however, and that of the parties before this Court, concerned the

issue of whether the formation of Safbank and the transfer to it of the unincorporated liner operations of Bank Line and Safmarine constituted a corporate change contemplated by sections 1398(1) and 1369(b).

In *Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578 (2d Cir.1988), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988), the Second Circuit discussed the legislative purpose underlying section 1398:

> Congress did not intend to treat, as an employer withdrawal from a plan, mere changes in the form or structure of an employer that do not alter the employer's basic relationship with, participation in, or obligation to, the plan or change the nature of the employer's operations.

851 F.2d at 584. Thus, the Court declined to impose withdrawal liability where partners sold their interests to new partners, but the partnership continued to exist. Mere change in ownership, the Court ruled, was insufficient to constitute a withdrawal where the entity continued to be responsible for contributing to the pension fund. *Park South Hotel* does not apply to the Safbank joint venture because the case at bar presents a different scenario. Here, the contributing organizations—Bank Line and Safmarine—ceased operations in the Port of New York. They transferred their operations to a new entity, Safbank, that is not a member of either controlled group.[5] This was a significant change in the employers' obligations and altered their basic relationship to the Fund. Thus, Bank Line and Safmarine may not avail themselves of the exemption fashioned in *Park South Hotel.*

■ Bank Line and Safmarine also rely on the Seventh Circuit's opinion in *Central States, Southeast & Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428 (7th Cir.1986), arguing that a joint venture should not incur withdrawal liability where there is no decrease in the level of employment. This analysis would prevent a determination of whether a withdrawal occurred until years after a transaction was effected. Although in the case at bar Safbank has contributed to the Fund amounts substantially equivalent to the combined previous contributions of Bank Line and Safmarine, in many joint ventures total contributions might be reduced. In fact, one might expect employment levels to decrease due to the economies of scale that might be achieved as a result of a successful joint venture. The Court rejects the suggestion that a determination of withdrawal liability must await evidence of a change in employment levels. While a showing that employment levels did not decrease in the wake of a joint venture is required to qualify for the section 1398 exemption, it is not sufficient. Rather, the party seeking the exemption must demonstrate compliance with all the conditions of the statute. *Central States Pension Fund* thus does not support the position of Bank Line and Safmarine.

In designing a comprehensive scheme to regulate multiemployer plans and their contributing members, Congress failed to fashion a particular exemption for joint ventures. The legislative history and purposes do not permit the Court to corrupt the statutory scheme by creating broad exemptions to liability imposed under the MPPAA. Where parties to a transaction seek to avoid withdrawal liability, they must structure the transaction in a manner that comports with one of the specified exemptions.

■ One change exempted from withdrawal liability is a "reorganization which involves a mere change in identity, form, or place of organization, however effected."[6] 29 U.S.C. § 1369(b)(1). The Court has de-

---

5. Under the definition of controlled group as used in ERISA, an organization is part of a controlled group if the group possesses at least 80% of the total stock value or at least 80% of the total voting power of the stock. *See* 26 C.F.R. § 1.414(c)–2(b). Thus, neither the Andrew Weir Group nor the Safren Group owns a controlling interest in Safbank.

6. Although Bank Line and Safmarine argue that the joint venture contains elements of various structural changes listed in section 1369(b), the Court will separately address each type of structural change. There is no "catch-all" provision in section 1369(b) that allows the Court to fashion a tailor-made exemption to withdrawal liability for this joint venture.

termined that the joint venture is not encompassed within this provision. As the arbitrator observed, the formation of Safbank and the transfer of operations to it "involved the creation of an entirely new and separate corporate entity, without any of the original corporate entities changing its identity or form in any respect." Award at 22. Neither the language of section 1369(b)(1) nor the Second Circuit's decision in *Park South Hotel* supports the contentions of Bank Line and Safmarine that they qualified under this provision for an exemption from withdrawal liability for this transaction.

■ Similarly, the formation of Safbank was not a "liquidation into a parent corporation." 29 U.S.C. § 1369(b)(2). Thus, section 1369(b)(2) does not provide a safe harbor for Bank Line and Safmarine.

■ The formation of the joint venture was not a "merger" or a "consolidation" within the meaning of section 1369(b)(3). These terms have well-established meanings within the corporate reorganization context. A merger is generally construed to be a transaction wherein two or more corporations combine and one of the corporations continues to exist, as the successor corporation. In a consolidation, two or more corporations combine together such that they all cease to exist and a new corporation emerges. The creation of Safbank can not properly be described as a merger or a consolidation. Initially, Bank Line's and Safmarine's divisions were not incorporated entities that were capable of engaging in this type of reorganization. More importantly, neither Bank Line nor Safmarine actually ceased to exist, as required by the definitions of merger and consolidation. Rather, they merely transferred certain functions or assets to the joint venture. Thus, Bank Line and Safmarine cannot claim that the formation of the Safbank joint venture constituted a merger or a consolidation such that they are exempted from withdrawal liability.

■ The sole remaining type of reorganization available to Bank Line and Safmarine is a "division." 29 U.S.C. § 1369(b)(3). Unlike the terms merger and consolidation, division does not appear to have an established meaning. The Pension Benefit Guaranty Corporation ("PBGC"), the governmental entity charged by Congress with the administration of the MPPAA's withdrawal liability provisions, has described as a "division" the distribution of stock of a corporate subsidiary to the shareholders of the parent. *See* PBGC Opinion Letter 85–29 (Dec. 5, 1985). Presumably, the following example provided in the report of the House Committee on Ways and Means on the MPPAA legislation would be another example of a division:

> P corporation owns 100% of the stock of S corporation, a subsidiary that has an obligation to contribute to a multiemployer plan on behalf of its employees.... If P sells all of its interest in S to an unrelated party, the controlled group consisting of P and S would cease to exist. However, if S continues to have an obligation to contribute to the plan, no withdrawal would be considered to have taken place merely because of the change in ownership of S.

H.Rep. No. 96–869, Part II, 96th Cong., 2d Sess., 16 (1980), reprinted in 1980 U.S.C.C.A.N. 2918, at 3005–06; *see also* 126 Cong.Rec. 20189, 20193 (July 29, 1980) (Joint Explanation by Chairmen of Senate Committees on Finance and Labor and Human Resources).

Thus, the term "division," as used in the MPPAA, appears to connote a transaction whereby the stock of a contributing corporation is "divided" away from its controlled group and acquired by or distributed to new owners. As the Second Circuit held in *Park South Hotel*, mere changes in ownership do not precipitate withdrawal liability. 851 F.2d at 584. The formation of Safbank and the transfer to it of the liner operations of Bank Line and Safmarine does not fall within the scope of the definition of "division." In this case, unincorporated operations were transferred out of each controlled group. Accordingly, the Court has determined that this transaction may not properly be classified as a "division" for purposes of avoiding withdrawal liability.

Bank Line and Safmarine argue that their transaction is analogous to transactions that would be exempt from withdrawal liability, and that imposing liability on them elevates form over substance. They point to PBGC decisions indicating that an unincorporated division may be transferred under section 1398 without incurring withdrawal liability by *first* incorporating the division and then transferring the subsidiary's stock to the new owner, which continues covered operations. *See, e.g.*, PBGC Opinion Letter 90-1 (Mar. 29, 1990), PBGC Opinion Letter 85-15 (May 31, 1985), PBGC Opinion Letter 84-7 (Dec. 20, 1984). While Bank Line and Safmarine may be correct in their observation that Safbank's formation is analogous to exempted transactions, the prescribed requirements of the exemption were designed by Congress as part of a comprehensive scheme to ensure that multiemployer pension plans are protected from withdrawals by contributors that might leave the plan with extensive unfunded pension liability. The procedures available to contributing organizations by which they may transfer their operations to a successor without incurring withdrawal liability are clearly defined by sections 1384 and 1398 of the MPPAA. It is not sufficient that a transaction be analogous to an exempted transaction. The failure to satisfy the statutory requirements results in a failure to qualify for an exemption from withdrawal liability.

Additionally, Bank Line and Safmarine argue that the Fund will be unjustly enriched if withdrawal liability is imposed because Safbank continues to make contributions to the Fund at a level that approximates the combined annual contributions previously made by Bank Line and Safmarine. No equitable argument, however, can overcome the failure of Bank Line and Safmarine to structure the transfer of operations to Safbank in a manner that conforms to the requirements of section 1398. The equitable claims of Bank Line and Safmarine do not overcome the failure to satisfy the requirements of the MPPAA. *See, e.g., Brentwood Financial Corp. v. Western Conference of Teamsters Pension Trust Fund*, 902 F.2d 1456, 1460

(9th Cir.1990); *Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 433 (7th Cir.1986); *Jaspan v. Certified Indus., Inc.*, 645 F.Supp. 998, 1005 (E.D.N.Y.1985). Because Bank Line and Safmarine failed to satisfy the requirements of section 1398, they may not rely on that provision to avoid withdrawal liability under the MPPAA.

C. *Applicability of the Sale of Assets Provision*

Despite their failure to present the issue to the arbitrator, Bank Line and Safmarine argue that the Court should apply the provisions of section 1384 of the MPPAA and find that Safmarine is not liable for withdrawal obligations under the terms of that provision. Safmarine argues that the issue was raised and addressed by the arbitrator *sua sponte*, that presentation of the issue to the Fund in the application to reconsider the determination of withdrawal liability sufficiently raised the issue, and that the Court has the authority to address for the first time on appeal issues of law that require no additional findings of fact. The Court has determined that all the grounds suggested by Safmarine are without merit and, therefore, the applicability of section 1384 is not properly before this Court.

Section 1401 of the MPPAA provides that:

> Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 [29 U.S.C. §§ 1381–1399] shall be resolved through arbitration.

29 U.S.C. § 1401(a)(1). The arbitration provision of the MPPAA constitutes an exhaustion of administrative remedies requirement. *See, e.g., ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 886 (2d Cir.1988); *T.I.M.E–DC, Inc. v. Management–Labor Welfare & Pension Funds*, 756 F.2d 939, 944–45 (2d Cir.1985). In *T.I.M.E.–DC*, however, the Second Circuit held that the exhaustion doctrine was not implicated in that case,

despite the plaintiff's failure to proceed to arbitration prior to filing suit, because: (1) there were no issues of fact to resolve; (2) the Court expected that the parties would seek judicial review of any decision an arbitrator might have reached; and (3) the section of the MPPAA that was the subject of the suit, section 1415, was "outside the scope of those issues that Congress directed to the arbitrator." 756 F.2d at 945. Thus, the Court excused the failure to submit the dispute for arbitration.

The exception to the exhaustion requirement fashioned in *T.I.M.E.–DC* does not apply to the instant case. Although there are no contested issues of fact, the statute clearly requires that disputes arising under section 1384 of the MPPAA must be resolved, in the first instance, by arbitration. Furthermore, the purposes of the arbitration provision would be subverted if a litigant could advance new legal theories at each stage of the dispute resolution process. Bank Line and Safmarine effectively abandoned any claim under section 1384 by failing to pursue that theory in the arbitration proceedings. Although the failure to exhaust administrative remedies may lead to harsh results, as the Second Circuit has noted, "the harshness of the default is largely 'a self-inflicted wound.'" *ILGWU Nat'l Retirement Fund*, 846 F.2d at 887 (quoting *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129 (3d Cir.1986)).

Moreover, the Court rejects the suggestion that the arbitrator raised the section 1384 exception *sua sponte* and determined that the exception would apply in this case. Rather, the arbitrator's discussion compared the requirements of section 1384 to those of section 1398 in determining whether the corporate reorganization exemption properly applied. The arbitrator explicitly stated that no section 1384 issues were presented to him and he therefore had "no occasion to consider them." Award at 26 n. 9.

Bank Line and Safmarine have failed to preserve for review by this Court any issue regarding the applicability of section 1384. Because of their failure to exhaust administrative remedies, Bank Line and Safmarine

are barred from presenting this issue at this late juncture.

### D. *Were Bank Line and Safmarine "Employers" under the MPPAA?*

█ Bank Line and Safmarine next argue that they are not "employers" within the meaning of the MPPAA and thus are not liable for withdrawal penalties. Recognizing that the Second Circuit's decision in *Korea Shipping Corp. v. NYSA–ILA Pension Trust Fund*, 880 F.2d 1531 (1989), if still good law, compels a finding that they are "employers," Bank Line and Safmarine argue that a recent Supreme Court decision undermines the *Korea Shipping* decision and requires the Court to apply a common law definition of "employer." *See Nationwide Mut. Ins. Co. v. Darden*, — U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). Bank Line and Safmarine would not be encompassed within a common law definition of "employer."

Recognizing that the MPPAA itself contains no definition of the term "employer," the *Korea Shipping* Court looked to the definition of "employer" in Title I of ERISA to inform its definition. 880 F.2d at 1536. Title I of ERISA, although not applicable of its own force, informs the definition of "employer" as that term is used in the MPPAA. An employer is

any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan.

29 U.S.C. § 1002(5). The Second Circuit, considering the purposes and policies underlying the MPPAA, determined that the common law definition of employer was too restrictive to accomplish the purposes of the MPPAA. 880 F.2d at 1537. The Court stated that:

[T]o adopt the meaning of the word employer the appellants urge would open a gaping hole in many multiemployer plans. Such a common law definition of employer would eliminate withdrawal liability for such a significant number of contributors as to threaten those plans' financial viability and potentially make them victims of the precise threat Con-

gress aimed to shield them from when it enacted the MPPAA.

880 F.2d at 1537. The Court thus ruled that the purposes of the MPPAA required a definition of "employer" that was broader than the common law definition. Bank Line and Safmarine concede that they would be considered employers under the Second Circuit's analysis in *Korea Shipping.*

In *Darden,* the Supreme Court rejected the Fourth Circuit's suggestion that the common law definition of the term "employee" was too narrow to effectuate the purposes of ERISA. —— U.S. at ———— ——, 112 S.Ct. at 1348–50. Critical to the Court's determination was the fact that the ERISA definition was vexatiously circular: "any individual employed by an employer" is considered an employee under ERISA. 29 U.S.C. § 1002(6). Thus, the statute's language was singularly unhelpful. Justice Souter, writing for a unanimous Court, lamented the recurring difficulties the courts have encountered in attempting to define the term "employee" in various federal statutes, noting that Congress has repeatedly amended a statute to prescribe the use of a common law definition of "employee" after a Supreme Court decision broadened the scope of that term. *Compare NLRB v. Hearst Pubs., Inc.,* 322 U.S. 111, 120–29, 64 S.Ct. 851, 855–59, 88 L.Ed. 1170 (1944) (using broad definition of "employee" for NLRA) *with NLRB v. United Ins. Co.,* 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968) (discussing amendment of NLRA after *Hearst Pubs.); and compare United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (broad definition for purposes of Social Security Act) *with United States v. W.M. Webb, Inc.,* 397 U.S. 179, 183–88, 90 S.Ct. 850, 852–54, 25 L.Ed.2d 207 (1970) (discussing Congressional reaction to *Silk* ).

The Court explicitly distinguished the *Darden* case from *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), where the Court applied a broad definition of "employee" because the language of the Fair Labor Standards Act indicated that Congress intended to include within the definition certain persons who would not be defined as employees under the common law. —— U.S. at ——, 112 S.Ct. at 1350. Additionally, the flexibility and indeterminacy of the test fashioned by the Fourth Circuit to determine when a person is an employee clearly informed the Supreme Court's decision. In determining whether a person was an employee, the Fourth Circuit would consider the expectation of the employee regarding his entitlement to benefits, reliance on that expectation, and disparity of bargaining power. *See Darden v. Nationwide Mutual Ins. Co.,* 922 F.2d 203, 205 (4th Cir.1991). The Supreme Court complained that

> Any such approach would severely compromise the capacity of companies like Nationwide to figure out who their "employees" are and what, by extension, their pension-fund obligations will be.

—— U.S. at ——, 112 S.Ct. at 1350.

*Darden* clearly does not affect the vitality of *Korea Shipping.* First, the definition of "employer" in ERISA, unlike the definition of "employee," clearly indicates legislative intent to extend the definition beyond the traditional common law definition. By including within the definition of employer any person who acts "indirectly in the interest of an employer, in relation to an employee benefit plan," 29 U.S.C. § 1002(5), the statute on its face extends beyond the common law definition.

Further, Bank Line and Safmarine can hardly argue that this definition of employer impedes their ability to calculate their ERISA obligations. Under *Korea Shipping,* persons who are contractually obligated to pay an assessment to another organization, in the instant case NYSA, which acts as a conduit to channel part of the assessments to a pension fund, are considered "employers" and are subject to withdrawal liability. The purposes of the MPPAA properly are served by adhering to the Second Circuit's definition of employer in *Korea Shipping.* The Court therefore finds that Bank Line and Safmarine are employers within the meaning of the MPPAA and are liable for withdrawal obligations pursuant to 29 U.S.C. § 1381(a).

## CONCLUSION

For all the foregoing reasons, the motion to confirm the arbitration is granted. Judgment in *Bowers v. Andrew Weir Shipping, Ltd.*, 92 Civ. 3728 (PKL), shall be entered in favor of plaintiffs. Defendant South African Marine Corp., Ltd., is liable to the NYSA–ILA Pension Trust Fund for withdrawal liability in the amount of $1,404,752. Defendant Andrew Weir Shipping, Inc., is liable to the NYSA–ILA Pension Trust Fund for withdrawal liability in the amount of $252,181. With respect to *Andrew Weir Shipping, Ltd. v. NYSA–ILA*, 92 Civ. 3781 (PKL), the motion to vacate the arbitration is denied and the motion of plaintiffs for summary judgment is denied.

SO ORDERED.