John BOWERS, James A. Capo, Albert Cernadas, Sergio Cassaine, Jr., Frank Lonardo, S.Y. Kuo, Captain, Thomas Popola, John W. Millard, as Trustees for and on the behalf of the NYSA–ILA Pension Trust Fund, Plaintiffs–Appellees,

v.

ANDREW WEIR SHIPPING, LIMITED, formerly known as Bank Line Ltd., Safbank Line Limited, South African Marine Corp., Ltd., Defendants–Appellants.

ANDREW WEIR SHIPPING LIMITED, formerly known as Bank Line Limited, South African Marine Corp., Ltd., Safbank Line Limited, as successor in interest, Plaintiffs–Appellants,

v.

NEW YORK SHIPPING ASSOCIATION–INTERNATIONAL LONGSHOREMAN'S ASSOCIATION PENSION TRUST FUND, Board of Trustees of the NYSA–ILA Pension Trust Fund, Defendants–Appellees.

No. 399, Docket 93–7014.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1993.

Decided June 22, 1994.

Walter H. Lion, New York City (Maddy, Dalton & Lion, of counsel), for appellants.

Maura R. Cahill, New York City (Gleason & Mathews, of counsel), for appellees.

Before CARDAMONE, McLAUGHLIN and LAY *, Circuit Judges.

CARDAMONE, Circuit Judge:

Two shipping companies appeal from a final judgment entered on April 13, 1993 by the United States District Court for the Southern District of New York (Leisure, J.), that confirmed an arbitration award imposing withdrawal liability on them and in favor of a longshoreman's pension trust fund. The judgment appealed from dismissed appel-

* Hon. Donald P. Lay, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

lants' action to vacate the award and its motion for summary judgment. We affirm.

## BACKGROUND

### The Parties

This dispute involves the intertwining of two businesses, each of which has its own complex organizational scheme. One entity is a British company named Bank Line Limited (Bank Line), a wholly-owned subsidiary of Andrew Weir & Co., Ltd. (Andrew Weir Group), which is privately owned by the Weir family and several charitable trusts. In 1980 one of Bank Line's divisions began operating a cargo service between the United States, including the Port of New York, and South Africa. Subsequent to the events at issue, Bank Line was consolidated with other subsidiaries of the Andrew Weir Group into a new company called Andrew Weir Shipping Limited (Weir Shipping). Although Weir Shipping, as Bank Line's corporate successor, is the party in this action presently representing the interests of the Andrew Weir Group, for purposes of clarity we refer to the entity as Bank Line.

The other entity, South Africa Marine Corp., Ltd. (Safmarine), a South African wholly-owned corporate subsidiary of Safmarine and Rennies Holding Limited (Safren Group), had a division similarly engaged in cargo trade between the United States and South Africa. The Safren Group is a highly-diversified, publicly-traded South African corporation.

Neither Bank Line nor Safmarine had marine terminal facilities in the Port of New York; both contracted for these services. During the period they operated out of the Port of New York, the two respective divisions of these large companies, that is Bank Line and Safmarine, were members of the New York Shipping Association (NYSA or Shipping Association), an organization of ship operators, agents, stevedores and other shipping-related businesses. As members of the Shipping Association, Bank Line and Safmarine were bound by its bargaining agreement with the International Longshoreman's Association (ILA), the collective bargaining representative for the Port of New York's longshoremen.

Pursuant to the labor contract, steamship carriers pay to the Shipping Association assessments for its employees' benefits based on total tonnage loaded and unloaded from the carriers' vessels by longshoremen in the Port of New York. The Shipping Association remits a portion of the assessments it receives from its members to the NYSA–ILA Pension Trust Fund (Fund), which is managed by a board of trustees appointed by the ILA and the NYSA. *See generally Korea Shipping Corp. v. NYSA–ILA Pension Trust Fund,* 880 F.2d 1531, 1533–35 (2d Cir.1989) (explaining the foregoing in greater detail). Bank Line and Safmarine regularly paid assessments through the Shipping Association to the Fund into the year 1988.

Meanwhile, political pressure had been mounting during the mid–1980s for American business to cease commercial trading with the then apartheid-sponsoring government of South Africa, resulting in a precipitous drop in American trade with that nation. The economic fallout from the trade embargo had adverse economic consequences on Bank Line and Safmarine, leading to their signing of a "space charter and sailing" agreement in 1985 for the routes both businesses serviced between the U.S. and South Africa. Under that agreement the companies jointly scheduled their ships in a convenient manner, each carrying cargo for the other, which effectively reduced the number of vessels each had to operate to South Africa while at the same time offering cargo shippers more frequent sailings.

Prompted by the success of their contractual relationship, Safmarine and Bank Line entered into a joint venture on November 30, 1987 establishing Safbank Line Limited (Safbank), a separate British company, to operate ships between South Africa and the United States. Under the agreement Bank Line and Safmarine withdrew from the shipping trade, which was now to be served by Safbank. Bank Line and Safmarine continued their separate shipping operations on routes other than those between the U.S. and South Africa.

Safbank is 45 percent owned by Safmarine and 55 percent owned by Comeric Limited, a corporation 63 percent of whose stock is owned by Bank Line and 37 percent of which is indirectly owned by Safmarine. As a result of this somewhat complex corporate structure, the Andrew Weir Group has voting control of Safbank, while profits are distributed 65 percent to the Safren Group and 35 percent to the Andrew Weir Group. Each of those parent companies nominates three directors to Safbank's Board of Directors. Safbank assumed the goodwill, reputations, and customer relations of Bank Line's and Safmarine's United States–South Africa operations, and became bound by the collective bargaining agreement between the Shipping Association and the ILA by retaining an NYSA member as its general agent.

### The Dispute

The genesis of the dispute that is before us on appeal arises from letters from the Fund dated November 8, 1989 directed to Bank Line and Safmarine advising that it had received notice of their cessation of shipping operations. It gave the two companies notice that it had thereupon calculated their respective withdrawal liability at $1,404,752 for Safmarine and $252,181 for Bank Line, under the terms of the Employee Retirement Income Security Act of 1974 (ERISA) as amended by the Multi-employer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1001–1461 (1988 & Supp. IV 1992). The MPPAA requires an employer that withdraws from a multiemployer pension plan to pay its proportionate share of the plan's unfunded vested employee benefits, the so-called withdrawal liability. *See* 29 U.S.C. §§ 1381 (1988), 1391 (1988 & Supp. IV 1992).

Following Bank Line and Safmarine's joint request for reconsideration, the Fund reaffirmed its determination imposing withdrawal liability on them. Bank Line and Safmarine timely commenced arbitration, as required by 29 U.S.C. § 1401 (1988), which Safbank joined because its contribution history depends on whether it is a successor to Bank Line and Safmarine.

On April 27, 1992 the arbitrator sustained the Fund's determination. The following month the parties brought separate actions that were consolidated in the district court. Shortly thereafter, in June 1992, the Fund moved to confirm and enforce the arbitration award; Bank Line, Safmarine, and Safbank cross-moved to vacate the award, and for summary judgment on their claim that Bank Line and Safmarine were not subject to MPPAA's withdrawal liability provisions. Judge Leisure, in an order and thorough opinion dated December 7, 1992, confirmed the arbitration award and denied the cross-motion to vacate and for summary judgment. *See* 810 F.Supp. 522 (S.D.N.Y.1992). On March 15, 1993 the district judge issued an order and opinion amending the judgment to provide that Bank Line's and Safmarine's withdrawal liabilities are payable in accordance with the Fund's established schedules. *See* 817 F.Supp. 4 (S.D.N.Y.1993). This appeal followed.

### DISCUSSION

### I. VITALITY OF *KOREA SHIPPING*

■ As an initial matter, appellants maintain that the Supreme Court's decision in *Nationwide Mutual Insurance Co. v. Darden,* —— U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), undermines our holding in *Korea Shipping Corp. v. NYSA–ILA Pension Trust Fund,* 880 F.2d 1531 (2d Cir. 1989), which ruled that steamship vessel carriers who contribute to the NYSA–ILA pension fund are "employers" for purposes of MPPAA withdrawal liability. Under 29 U.S.C. § 1381(a), withdrawal liability is only assessed against employers. Thus, if appellants are correct in their assertion, there can be no statutory basis for assessing them withdrawal liability.

In *Korea Shipping* we defined the term "employer" in § 1381(a) as " 'a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.' " *See* 880 F.2d at 1537 (quoting district court opinion in the same case, 663 F.Supp. 766, 770 (S.D.N.Y.1987)). *Korea Shipping* went on to find that steamship carriers, situated similarly to appellants in this case, came within this definition. *See id.* at 1539–40; *see also Phil-*

*ippines, Micronesia & Orient Navigation Co. v. NYSA–ILA Pension Trust Fund,* 909 F.2d 39, 41 (2d Cir.) (per curiam) (same), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258, 261–62 (2d Cir.1990) (same).

In particular, after considering the purposes and policies underlying the MPPAA, *Korea Shipping* held that the common law definition of employer was too restrictive to accomplish the purposes of the MPPAA. *See* 880 F.2d at 1537.

> [T]o adopt the meaning of the word employer appellants urge would open a gaping hole in many multi-employer plans. Such a common law definition of employer would eliminate withdrawal liability for such a significant number of contributors as to threaten those plans' financial viability and potentially make them victims of the precise threat Congress aimed to shield them from when it enacted the MPPAA.

*Id.* Accordingly, the panel looked to the definition in Title I of ERISA, which was not applicable of its own force, but that was "fully consonant with the MPPAA's objectives." *Id.* Further, in the wake of *Korea Shipping,* three of our sister circuits have adopted the contributing obligor definition, specifically following the analysis it postulated. *See Imel v. Laborers Pension Trust Fund For N. Cal.,* 904 F.2d 1327, 1331 (9th Cir.), *cert. denied,* 498 U.S. 939, 111 S.Ct. 343, 112 L.Ed.2d 308 (1990); *Carriers Container Council, Inc. v. Mobile S.S. Ass'n, Inc.–ILA Pension Plan & Trust,* 896 F.2d 1330, 1343–44 (11th Cir.), *cert. denied,* 498 U.S. 926, 111 S.Ct. 308, 112 L.Ed.2d 261 (1990); *Seaway Port Auth. v. Duluth–Superior ILA Marine Ass'n Restated Pension Plan,* 920 F.2d 503, 507 (8th Cir.1990), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

In *Nationwide Mutual Insurance Co. v. Darden,* the Supreme Court in 1992 adopted for ERISA purposes the common law meaning for the term "employee" because the statutory definition of the word employee was completely circular. *See* —— U.S. at ——, 112 S.Ct. at 1348. *Darden* on its face

dealt of course with the definition of "employee," not "employer," the term defined in *Korea Shipping.* More importantly, the Supreme Court noted that borrowing the common law view of the term "employee" was dictated by the lack of any clear legislative definition to the contrary. *See id.* Similarly, as Justice Souter, writing for a unanimous Court, noted, the adoption of the common law definition of employee would not "thwart the congressional design or lead to absurd results." *Id.* We reached the opposite conclusion as described above with respect to the term "employer" in *Korea Shipping. See* 880 F.2d at 1537. We see no principled reason why *Korea Shipping* should be disturbed in light of *Darden* so as to require us to apply to the term "employer," its common law meaning—one that obviously would not include appellants. Hence, we reaffirm *Korea Shipping's* holding.

## II. WITHDRAWAL LIABILITY

The more difficult question to be resolved is whether the formation of Safbank, and the transfer to it of the unincorporated liner operations of Safmarine and Bank Line, constitutes the sort of corporate change contemplated by 29 U.S.C. §§ 1398(1) (Supp. IV 1992) and 1369(b) (1988), which would afford Safmarine and Bank Line an exemption from MPPAA withdrawal liability.

At the outset, we address the standard of review. The district court believed the decisions of an arbitrator on matters of law in an MPPAA withdrawal dispute are reviewed *de novo. See* 810 F.Supp. at 526. We assume this to be the appropriate standard, as do all the other circuits that have considered the issue. *See Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan,* 3 F.3d 994, 999 (7th Cir.1993), *petition for cert. filed,* 62 U.S.L.W. 3378 (U.S. Nov. 12, 1993); *Crown Cork & Seal Co. v. Central States S.E. & S.W. Areas Pension Fund,* 982 F.2d 857, 860 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); *CMSH Co. v. Carpenters Trust Fund for N. Cal.,* 963 F.2d 238, 240 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 185, 121 L.Ed.2d 130 (1992); *Trustees of Colo. Pipe Indus. Pension Trust v. Howard Elec. &*

*Mechanical Inc.,* 909 F.2d 1379, 1386 (10th Cir.1990), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); *Union Asphalts & Roadoils, Inc. v. MO–KAN Teamsters Pension Fund,* 857 F.2d 1230, 1233 (8th Cir.1988), *cert. denied,* 490 U.S. 1022, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 727 F.2d 1204, 1207 n. 7 (D.C.Cir.1984); *Republic Indus., Inc. v. Teamsters Joint Council No. 83 Pension Fund,* 718 F.2d 628, 641 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Since the parties have not controverted this standard of review in the MPPAA context, and because its resolution is not here critical, we do not presently rule that *de novo* review is the correct standard in withdrawal dispute litigation under MPPAA.

Passing now to an analysis of the corporate changes, it must be observed that in designing a comprehensive scheme to regulate employer plans and to exercise control over the withdrawal of their contributing members, Congress did not include exemption from withdrawal liability for joint ventures. Section 1398 of the MPPAA provides an exemption from withdrawal liability only under certain circumstances:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
>
> (1) an employer ceases to exist by reason of—
>
> (A) a change in corporate structure described in [29 U.S.C. § 1369(b) ]. ...

29 U.S.C. § 1398(1)(A). As § 1398 makes clear, an employer wishing to avoid withdrawal liability must come within one of the exceptions set forth in § 1369(b), which reads in relevant part as follows:

> (1) Change of identity, form, etc.
>
> If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.
>
> . . . .

> (3) Merger, consolidation, or division
>
> If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.

29 U.S.C. § 1369(b).

The arbitrator and the district court both concluded that none of the categories of corporate change set forth in the MPPAA granting a withdrawal liability exemption apply to the transfer of Safmarine's and Bank Line's operations to Safbank. *See* 810 F.Supp. at 526–29.

Bank Line and Safmarine challenge this conclusion, insisting the joint venture formation of Safbank was a division, a merger, a consolidation, or a mere change of form. Because none of these terms are defined in either ERISA or the MPPAA, it is our task to ascertain what Congress meant by them and determine whether appellants' corporate changes fit within such definition. Thus, for purposes of this appeal, the primary substantive issue to be determined is whether the formation of Safbank is encompassed by § 1369(b).

### A. *Division*

■ While "division" is not a term of art with a widely established meaning, the district court—relying on the scant legislative history and an opinion letter of the Pension Benefit Guaranty Corporation—concluded that the term, "as used in the MPPAA, appears to connote a transaction whereby the stock of a contributing corporation is 'divided' away from its controlled group and acquired by or distributed to new owners." 810 F.Supp. at 528. We agree with this analysis of the term "division" and adopt it. *See Teamsters Pension Trust Fund v. Central Mich. Trucking, Inc.,* 857 F.2d 1107, 1108 (6th Cir.1988) (finding such a "spin-off" transaction to be a change in corporate structure exempt from withdrawal liability); *cf. Redding v. Commissioner,* 630 F.2d 1169, 1173 (7th Cir.1980) (finding such a transaction to meet the requirements for a tax-exempt corporate division), *cert. denied,* 450

U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 338 (1981).

In the instant case, the formation of Safbank obviously is not a division under our adopted definition of that term. Bank Line's and Safmarine's unincorporated divisions were transferred to an entirely new entity, Safbank. No stock changed hands in the transaction. Appellants' attempt to hitch their wagon to this provision—merely because the entities they transferred to Safbank were called "divisions"—is a semantical subterfuge to which a court should not accord legal consequence. Further, we note that Congress' inclusion of "division" in § 1369(b)(3) along with the recognized terms "merger" and "consolidation" suggests its aim that "division" connote some form of business transformation, one not accomplished simply by naming a business operating unit a "division."

In anticipation of the foregoing analysis, appellants declare that requiring a stock transfer exalts form over substance. To the contrary, it is our responsibility to make sure the legislative tests for permitting the avoidance of withdrawal have been satisfied, not to determine whether extraneous considerations could lead to a different conclusion. *See Brentwood Fin. Corp. v. Western Conference of Teamsters Pension Trust Fund,* 902 F.2d 1456, 1461 (9th Cir.1990); *see also Central States, S.E. & S.W. Areas Pension Fund v. Bellmont Trucking Co.,* 788 F.2d 428, 433 (7th Cir.1986) ("[W]e are bound by the particular rules enacted by Congress [in the MPPAA] and are not free to carve out our own exceptions merely because we believe they would not undermine Congress' goals."); *New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit Mix Corp.,* 612 F.Supp. 1003, 1009 (N.D.N.Y.1985) ("In light of the policy behind ERISA, as amended by the MPPAA, exemptions to a withdrawing employer's liability should be narrowly construed."). In the absence of any clear indication that the meaning of the term "division" in the statute could encompass the formation of Safbank, appellants are not entitled to an exemption from withdrawal liability under this provision.

### B. *Merger or Consolidation*

The terms "merger" and "consolidation" also do not neatly fit this joint venture. These terms have black-letter law definitions. "A merger of two corporations contemplates that one corporation will be absorbed by the other and will cease to exist while the absorbing corporation remains." *Engel v. Teleprompter Corp.,* 703 F.2d 127, 131 (5th Cir. 1983); *see also Black's Law Dictionary* 988 (6th ed. 1990) (defining merger as "[a]n amalgamation of two corporations pursuant to statutory provision in which one of the corporations survives and the other disappears."). A consolidation is the combination of two or more corporations into a newly created entity. *See Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 440 (7th Cir.1977); *see also Black's Law Dictionary* 309 (6th ed. 1990) (same).

In the instant case, both Safmarine and Bank Line continue to exist in exactly the same corporate form as they did prior to the formation of Safbank. No corporation or parent went out of business, and there was no change in corporate structures of the principals or parent corporations. Rather, the sole event of any legal consequence was the creation by the two corporations of Safbank as an entirely new third entity.

Appellants' contention that we should consider the creation of Safbank as a *de facto* merger is unpersuasive. It is quite clear that a *de facto* merger is no different conceptually from an ordinary merger, except for the fact that there has not been "compliance with the statutory requirements for a merger." *Arnold Graphics Indus., Inc. v. Independent Agent Ctr., Inc.,* 775 F.2d 38, 42 (2d Cir.1985); *see also In re Augie/Restivo Baking Co.,* 860 F.2d 515, 519–20 (2d Cir.1988) (setting forth the requirements for the finding of a *de facto* merger). In the case at hand, as just described, the conceptual requirements of an ordinary merger were not met; *a fortiori,* there can be no *de facto* merger.

### C. *Change in Form*

Appellants also declare that Safmarine and Bank Line ceased to exist as employers merely by reason of a change in form

or structure, even though the change was one not explicitly recognized by the statute. They rely on our holding in *Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988), for the proposition that under the change in corporate structure provision the court should take a "common sense" approach to corporate reorganizations.

In *Park South Hotel*, we held that a sale of a partnership to entirely new partners did not warrant withdrawal liability. The decision hinged on the continuation of the partnership itself: "At all pertinent times, both before and after the sale, it was the partnership ... that was the 'employer.' Before the sale it was the partnership that made the payments to the Fund, and the partnership continued to make those payments after the sale." *Id.* at 582. As the panel noted, "Congress did not intend to treat, as an employer withdrawal from a plan, mere changes in the form or structure of an employer that do not alter *the employer's* basic relation with, participation in, or obligation to, the plan or change the nature of *the employer's* operations." *Id.* at 583–84 (emphasis added).

None of these indicia are present in this case. Safmarine and Bank Line have been completely supplanted by Safbank. And, although they remain viable entities themselves, they maintain no relationship with the Fund, the ILA or the stevedores. Notwithstanding these facts, appellants direct us to a clause in the agreement establishing Safbank under which that company purports to assume the pension liability of Bank Line and Safmarine. This clause offers little solace to the Fund. Safbank has no fixed assets of its own to secure any future liability, as the director of finance for the Andrew Weir Group admitted. Moreover, in the event that Safbank was unable to satisfy any financial obligation, Bank Line and Safmarine's reservation of only secondary liability leaves the Fund with the potentially onerous task of securing monies from parties holding only remote responsibility. As already indicated, exceptions to withdrawal liability under MPPAA must be narrowly construed.

Moreover, besides encompassing situations like that in *Park South Hotel*, § 1369(b)(1) also covers *pro forma* matters like changes in corporate names or incorporation of a non-incorporated business. Since the formation of Safbank does not fall within any of these recognized categories, § 1369(b)(1) is inapplicable. Consequently, the arbitrator and the district court correctly concluded that the provisions of 29 U.S.C. § 1369(b) do not envisage the formation of a joint venture, like Safbank.

### III. WAIVER OF SALE OF ASSETS CLAIM

The claim that the formation of Safbank was a sale of assets exempting Bank Line from withdrawal liability pursuant to 29 U.S.C. § 1384 (1988 & Supp. IV 1992) was not raised before the arbitrator. Appellants assert the district court abused its discretion when it ruled that such failure waived this claim. We disagree.

■ The MPPAA provides that:

Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under [29 U.S.C. §§ 1381–1399] shall be resolved through arbitration.

29 U.S.C. § 1401(a)(1). We have interpreted the arbitration requirement as "an exhaustion of administrative remedies requirement," *ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 886 (2d Cir.1988), as have many other circuits, *see Trustees of Colo. Pipe Indus. Pension Trust*, 909 F.2d at 1385 (listing cases).

■ As previously observed in *Levy Brothers Frocks*, Congress envisioned that decisions regarding statutory interpretation under § 1384 "would be made by the arbitrator in the first instance." *Id.* Appellants do not fall within the narrow exception to the arbitration-first requirement under the MPPAA articulated in *T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir.1985). That exception has three prongs: (1) there must be no unresolved questions of fact or issues of contract interpretation; (2) review must be judiciously economical; and (3) the

issue must fall "outside the scope of those issues that Congress directed to the arbitrator," that is, those determinations made under 29 U.S.C. §§ 1381–1399 pursuant to 29 U.S.C. § 1401(a)(1). *Id.* Because appellants argument here pertains to the applicability of 29 U.S.C. § 1384, it does not meet the third prong of *T.I.M.E.–DC, Inc.*'s arbitration exception.

Nor do the existing circumstances warrant the crafting of a new exception to the arbitration first rule. *See I.A.M. Nat'l Pension Fund Plan A v. Clinton Engines Corp.,* 825 F.2d 415, 422 (D.C.Cir.1987) ("[A]n exception for cases raising questions of statutory interpretation would 'drastically diminish the prime role Congress so plainly assigned to arbitration in the MPPAA dispute resolution scheme.'") (quoting *Grand Union Co. v. Food Employers Labor Relations Ass'n,* 808 F.2d 66, 70 (D.C.Cir.1987)). Thus, whatever merit the sale of assets argument under § 1384 may or may not have, it must first be made to the arbitrator. Not having been so made, the argument was waived.

## CONCLUSION

Accordingly, for the reasons set forth above, the judgment of the district court is affirmed.