NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, by its Trustees John Bulgaro, Gary Staring, Brian R. Masterson, Daniel W. Schmidt, Michael S. Scalzo, Sr., Thomas K. Wotring, and J. Dawson Cunningham, Plaintiff,

v.

DOREN AVENUE ASSOCIATES, INC.; Express Services, LLC; and S & P Trucking LLC, Defendants.

No. 5:03–CV–1338.

United States District Court, N.D. New York.

May 7, 2004.

Paravati, Karl, Green & Debella, Utica, NY (Vincent M. DeBella, Peter Paravati, of counsel), for plaintiff.

Ulmer & Berne LLP, Cleveland, OH (Ronald L. Kahn, Britt J. Rossiter, of counsel), for Defendants Express Services, LLC and S & P Trucking LLC.

Harris Beach LLP, Pittsford, NY (Daniel J. Moore, Greg J. McDonald, of Coun-

sel), for Defendants Express Services, LLC and S & P Trucking LLC.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

On November 3, 2003, plaintiff New York State Teamsters Conference Pension and Retirement Fund ("the Fund"), by its Trustees, filed suit against defendants Doren Avenue Associates, Inc., Express Services, LLC. ("Express" or "defendants"), and S & P Trucking, LLC ("S & P" or "defendants"), seeking pension interim withdrawal liability payments on the basis that defendants were under common control with (*first* cause of action) or the alter egos of (*second* cause of action) Howard's Express, Inc. ("Howard's"), a company that was once obligated to make pension contributions to the Fund.[1]

On December 19, 2003, defendants filed a motion for a preliminary injunction, seeking to halt the Fund's attempts to collect interim withdrawal liability payments pending arbitration. (Docket Nos. 8–10.) On January 27, 2004, the Fund filed a cross-motion for summary judgment, seeking an order directing defendants to make the interim payments, pursuant to Fed.R.Civ.P. 56. (Docket Nos. 16, 32.) On February 17, 2004, defendants filed a cross-motion for summary judgment, seeking dismissal of the complaint, also pursuant to Fed.R.Civ.P. 56. (Docket No. 20.) Oral argument was heard on April 7, 2004, in Utica, New York. Decision was reserved.

## II. BACKGROUND

### A. Summary Judgment Standard and Local Rule 7.1(a)(3)

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec.,* 475 U.S. at 587, 106 S.Ct. 1348.

 Despite these obligations of the nonmoving party, "in the absence of a local rule, a district court may not grant sum-

---

1. The Fund has requested an entry of default judgment against Doren Avenue Associates, Inc., which has failed to file an answer to the complaint. (Docket No. 29.) No opposition has been filed to such motion, and it will be granted.

mary judgment on the ground that the nonmovant's papers fail to cite to the record unless the parties are given actual notice of the requirement." *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470–71 (2d Cir.2002). The Northern District of New York provides just such a rule. Local Rule 7.1(a)(3) requires a nonmoving party to submit a mirror response to the moving party's statement of material facts, containing either an admission or denial of each allegation set forth by the moving party. "Each denial shall set forth a specific citation to the record where the factual issue arises." Loc. Rule 7.1(a)(3). A failure to comply with this requirement permits the district court to "deem admitted" the factual allegations improperly denied. *Id.* "Northern District courts have strictly applied Local Rule 7.1(a)(3)'s requirement." *Henzel v. Delaware Otsego Corp.,* 285 F.Supp.2d 271, 275 (N.D.N.Y. 2003) (collecting cases); *Garrett v. Reynolds,* No. Civ. 9:99CV2065, available at 2003 WL 22299359, at *3 (N.D.N.Y. Oct.7, 2003). Thus, in this district, a failure to provide specific record citations in a response to a statement of material facts is grounds for granting the moving party's summary judgment motion. *See Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003); *Jones v. SmithKline Beecham Corp.,* available at 309 F.Supp.2d 343, 346 n. 4 (N.D.N.Y.2004).

As noted above, both the Fund and defendants have moved for summary judgment in this case. The Fund's statement of material facts, which did not contain allegations relating to the merits of its causes of action,[2] and defendants' response to that statement, both contained citations to the record. Defendants' statement of material facts, which did contain allegations relating to the merits of the causes of action, also contained citations to the record. Of the 45 paragraphs in the Fund's response to this statement, 21 are conclusory denials, 16 are denied for lack of sufficient information, and none are accompanied by a record citation. Thus, per Local Rule 7.1(a)(3), the factual allegations in defendants' statement of material facts may be deemed admitted.

### B. Factual Background of First Cause of Action—Common Control[3]

To the extent the allegations relate to the ownership and control histories of Howard's, Express, and S & P, they will be deemed admitted, as even a scouring of the record reveals no factual issue.

Howard's was a an employer required to contribute to the Fund. At all times relevant to this case, Philip Boncaro, Sr. and Samuel Boncaro, Jr. each owned a 50% interest in the voting shares of Howard's, as well as an aggregate 89.6% interest in the non-voting shares. Their sons, Philip Boncaro, Jr. and Samuel Boncaro, III, owned no interest in Howard's voting shares, and an aggregate 3.4% interest in the non-voting shares. Howard's assets have since been purchased by an unrelated company.

Express, formed August 23, 2000, under the laws of New York, was a limited liability company engaged in the freight brokerage business. At all times relevant to this case, five individuals had equal 20% ownership interests in Express: (1) Philip Bon-

---

**2.** This was apparently because of the Fund's belief that all material issues must be referred to arbitration and the federal court's only limited role was to direct defendants to make the automatically required interim withdrawal liability payments.

**3.** This section also provides general background information not necessarily related to the *first* cause of action.

caro, Sr.; (2) Samuel Boncaro, Jr.; (3) Philip Boncaro, Jr.; (4) Samuel Boncaro, III; and (5) Edward Haddad. Express's assets have since been acquired by the same company that purchased the assets of Howard's.

S & P, formed October 1, 1999, under the laws of Pennsylvania, is a limited liability company engaged in the cartage business, picking up and delivering cargo primarily in eastern Pennsylvania. At all times relevant to this case, Philip Boncaro, Jr. and Samuel Boncaro, III had equal 50% ownership interests in S & P. No other individual had ownership or voting interests in the company.[4]

On March 31, 2003, Howard's filed for bankruptcy protection. Effective the next day, therefore, it completely ceased operations covered under the Fund. On June 9, 2003, the Fund, through its Executive Administrator, *see infra* note 5, wrote letters to defendants, and defendant Doren Avenue Associates, Inc., informing them that they were among the "several non-bankrupt entities" that the Fund had determined were "affiliated" with Howard's and therefore responsible for the withdrawal liability caused by the cessation of covered operations. (Docket No. 10, Exs. B, C.) Howard's withdrawal liability was over $11 million. The letters demanded that defendants either pay that lump sum within 60 days, or 65 monthly installments in excess of $216,000 each and a final payment of over $100,000, in order to satisfy the withdrawal liability. The letters set forth a payment schedule, and demanded an initial payment by August 9, 2003. To date, neither defendant has made any withdrawal liability payments.

On September 5, 2003, defendants timely requested that the Fund review its determination that they were responsible for the withdrawal liability payments, providing the sponsor with a detailed analysis of why neither could be "employers" under "common control" with Howard's for the purpose of assuming its liability. It does not appear as though the Fund responded to these requests. This action was commenced on November 3, 2003, and the motions followed.

On January 29, 2004, two days after the Fund cross-moved for summary judgment and well after defendants moved for a preliminary injunction, defendants filed a demand for arbitration, asking the arbitrator to make a "[f]inding of no obligation for the withdrawal liability" assessed in the notice from the Fund sponsor. (Docket No. 32, App., Ex. B.)

### C. Factual Background of Second Cause of Action—Alter Ego

To the extent the allegations in defendants' statement of material facts relate more to the Fund's alter ego claim, it is not necessary to deem them admitted. To be sure, most of the citations in defendants' statement of material facts are to affidavits of individuals connected in some way to Howard's, Express, and S & P. Nevertheless, aside from a few citations to exhibits that are either unpersuasive, not placed into proper context, or alone incapable of creating a triable issue of fact, the Fund has submitted no evidence to rebut these factual allegations. Defendants' allegations and the Fund's assertions, the latter of which have been gleaned not from its response to the statement of material facts but from a scouring of the record,

---

4. Doren Avenue Associates, Inc. was owned and/or controlled entirely by Philip Boncaro, Sr. and Samuel Boncaro, Jr., the principal owners and controllers of Howard's. It was

clearly under common control with or the alter ego of Howard's. This may be the reason that it defaulted in failing to answer the complaint.

will be outlined in more detail in Section B(2) of the DISCUSSION, *infra*. Moving for summary judgment in the absence of any discovery necessary to rebut defendants' affidavits and other evidence was a gamble the Fund chose to take.

## III. DISCUSSION

### A. *Jurisdictional Issue*

Before determining whether this is the proper forum in which to address the merits of the Fund's claims, and, in particular, whether defendants are employers responsible for the interim withdrawal liability payments, it is helpful to outline the statutory framework of the Multiemployer Pension Plan Amendments Act, 29 U.S.C. §§ 1381 *et seq.* ("MPPAA"), under which the Fund purports to assert its claims.

#### 1. *Statutory Framework*

The MPPAA amended ERISA because of Congressional concern that "existing legislation did not adequately protect plans from the adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans." *Doherty v. Teamsters Pension Trust Fund*, 16 F.3d 1386, 1388 (3d Cir.1994). Under the statute, an employer which permanently ceases covered operations under a pension plan into which it is required to contribute is subject to "withdrawal liability," in an amount equal to its share of the unfunded vested benefits owed to individuals by the fund at the time of withdrawal. 29 U.S.C. §§ 1381, 1383(a). After an employer withdraws from a plan, the plan sponsor is vested with the authority to determine the amount of withdrawal liability. *Id.* §§ 1382, 1391.

The plan sponsor must then notify the withdrawing employer of the liability, set a payment schedule, and formally demand payment. *Id.* §§ 1382(2), 1399(b)(1).[5] Within 90 days of receiving the notice, the employer may request a review of the sponsor's determination of liability or the payment schedule. *Id.* § 1399(b)(2)(A). Either side may thereafter initiate arbitration proceedings within 60 days of the earlier of: (1) the date on which the employer was notified of the sponsor's withdrawal liability determination and demand for payment, or (2) 120 days after the date of the employer's request for review. *Id.* § 1401(a)(1). Should the employer fail to request arbitration within the statutory time periods, the amount of withdrawal liability assessed by the plan sponsor in the notice becomes due and owing. *Id.* § 1401(b).

Regardless of whether an employer requests review from the sponsor, or initiates arbitration proceedings, it is responsible for paying interim withdrawal liability payments in accordance with the payment schedule set forth in the notice. *Id.* § 1399(c)(2). This is known as the MPPAA's "pay now, dispute later" mechanism, whereby the risk of loss is placed on the employer, which can recover, after arbitration, any monies it is found to have improperly paid. Where an employer fails to make interim payments in accordance

---

5. The "plan sponsor," and not the plan itself, is the entity the MPPAA charges with determining the withdrawal liability amount and sending notices to employer. In this case, the plan sponsor is the Fund's Board of Trustees. The Board of Trustees was not the signatory on the June 9, 2003, letters to defendants to defendant Doren Avenue Associates, LLC. It was noted only that the Board of Trustees was receiving a copy of the letters. The author of the letters was the Fund's Executive Administrator. However, whether it was proper for the Fund itself, through the Executive Administrator, as opposed to the Board of Trustees, to make the withdrawal liability determinations and send the notices has not been raised by defendants, and will not, therefore, be discussed here.

with payment schedule set by the sponsor, it is considered to be in default and the sponsor may bring a collection action to recover the unpaid interim payments and obtain an order requiring the employer to continue making the interim payments into the future until the outstanding amount of withdrawal liability has been satisfied. *Id.* §§ 1399(c)(2) and (5), 1401(d). This is a collection action commenced by the Fund against defendants as alleged employers.

## 2. *Employer Status*

■ The Fund claims that, because the issues of whether defendants were under common control with or alter egos of Howard's are questions reserved exclusively for an arbitrator, it is entitled to summary judgment and an order that defendants remit all past due interim withdrawal liability payments (including interest and liquidated damages thereon, plus attorney's fees), as well as all future interim withdrawal liability payments until the full withdrawal liability amount is satisfied.

Defendants have taken a few different positions. Initially, when moving for a preliminary injunction, they seemed to agree that whether or not they were under common control with or alter egos of Howard's were questions reserved for arbitration, and argued only that they should not be required to make interim withdrawal liability payments before such questions were answered. In support, defendants cited a slightly modified preliminary injunction standard, requiring proof that the Fund had no colorable claim against them, and that they would suffer irreparable financial harm if compelled to make the interim payments.

The Fund responded that no such "equitable exception" existed to the pay now, dispute later mechanism has been adopted by the Second Circuit and, in any event, conclusory allegations of potential bankruptcy are not enough to establish irreparable harm, especially in light of the plan-friendly MPPAA. The Fund then executed the puzzling tactic of moving for summary judgment, in the absence of discovery, on its claims. Though making such a motion placed the complete merits of its claims directly at issue, the Fund submitted little to no evidence, instead reiterating its argument that the substantive causes of action could only be addressed by an arbitrator.

Perhaps seeing an opening, defendants then cross-moved for summary judgment, arguing for the first time that whether they were under common control with or alter egos of Howard's were questions to be answered in this forum, and submitting detailed and extensive affidavits and other evidence relating to the merits of the Fund's claims.

Agreement is expressed with the Fund's argument that so-called equitable exceptions to the MPPAA's pay now, dispute later mechanism are unlikely to be recognized by the Second Circuit. *See Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 806 (2d Cir.1994) (indicating general doubt that "equitable" or "extraneous" considerations are to apply to the MPPAA). However, holding that a company is under common control with or the alter ego of an employer required to contribute to a pension plan is a decision that such company is an "employer" within the meaning of the MPPAA, and therefore subject to its arbitration provisions and pay now, dispute later mechanism.

■ The Second Circuit has stated that "whether [an entity] was an 'employer' within the meaning of the MPPAA is properly for the courts, not an arbitrator, to decide. Arbitration is prescribed [under the MPPAA] only for disputes 'between an *employer* and the plan sponsor.' " *Bowers*

v. *Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 261 (2d Cir.1990) (emphasis in original) (citations omitted); *I.L.G.W.U. Nat'l Ret. Fund v. Meredith Gray, Inc.*, 986 F.Supp. 816, 825 (S.D.N.Y. 1997).[6] As Judge Thomas McAvoy noted, there is a "difference between the statutory issue of whether defendants were ever a[n] MPPAA employer and the factual issue of whether defendants had ceased to be an MPPAA employer before the date of withdrawal. The former is a question for the Court to decide in this case, while the latter is relegated to an arbitrator's jurisdiction." *Bd. of Trustees of Trucking Employees v. Canny*, 900 F.Supp. 583, 590 (N.D.N.Y.1995); *see also Cent. States, S.E. & S.W. Areas Pension Fund v. Progressive Driver Servs., Inc.*, 940 F.Supp. 1311, 1314 (N.D.Ill.1996). In fact, answering whether an entity was ever an employer, the former question, effectively " 'decides the arbitrator's authority over a dispute" ' relating to the latter question, as he or she only has jurisdiction over entities that are "employers" within the meaning of the statute. *Progressive Driver*, 940 F.Supp. at 1314 (quoting *Banner Indus.*, 875 F.2d at 1291).

This distinction does not offend, and in fact is in alignment with, the Second Circuit's decision in *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879 (2d Cir.1988), which the Fund cites for the proposition that " 'a dispute over withdrawal liability determination must be submitted to arbitration, notwithstanding the defendants' assertion that it was not an 'employer' within the meaning of MPPAA.' " (Docket No. 32, p. 10.) The employer in *Levy Bros.* was unquestionably at one point obligated to contribute to the fund, making operative not the question of whether it was ever an employer, as is in dispute here, but instead whether it was an employer at the time of the withdrawal. Further, the panel pointed out (but did not affirmatively decide) that disputes over withdrawal liability determinations may not have to be submitted to arbitration where "an employer's connection to the fund is so attenuated as to support a defense that it was not an 'employer' ... and thus not obligated to submit to arbitration." *Levy Bros.*, 846 F.2d at 886. Subsequent to *Levy Bros.*, the Second Circuit in *Bowers*, as noted, held that whether an entity was ever an employer—again, an issue not in dispute in *Levy Bros.*, but certainly in dispute here—"is properly for the courts, not an arbitrator, to determine." 901 F.2d at 261. Thus, this is the proper forum in which to determine whether defendants were under common control with or the alter egos of Howard's, i.e., whether they were ever "employers" within the meaning of the MPPAA. *See I.L.G.W.U. Nat'l Ret. Fund v. ESI Group, Inc.*, No. 92 Civ. 0597, available at 2002 WL 999303, at *5 (S.D.N.Y. May 15, 2002) ("[T]he issue of whether Davend and ESI were part of a common control group with Gutmacher and therefore 'employers' within the meaning of the MPPAA, is an issue for the courts, not an arbitrator, to decide") (internal citations omitted).

In its reply papers, the Fund claims, apparently for the first time, that defen-

---

**6.** This view is well supported in other Circuits. *See Rheem Mfg. Co. v. Cent. States, S.E. & S.W. Areas Pension Fund*, 63 F.3d 703, 705–06 (8th Cir.1995); *Bd. of Trustees of Trucking Employees of N. N.J. Welfare Fund, Inc.—Pension Fund v. Centra*, 983 F.2d 495, 501 (3d Cir.1992); *Cent. States, S.E. & S.W. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir.1992); *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 122 (4th Cir.1991); *Banner Indus., Inc. v. Cent. States, S.E. & S.W. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir.1989); *Mason & Dixon Tank Lines, Inc. v. Cent. States, S.E. & S.W. Areas Pension Fund*, 852 F.2d 156, 157 (6th Cir.1988).

dants "undeniably *acted* as employer[s]" by filing requests with the Fund sponsor to review its determination, and by demanding arbitration, both of which are only effective when undertaken by "employers." (Docket No. 32, Mem. of Law, pp. 5–6) (emphasis added). Initially, one must question what, precisely, the Fund would surmise defendants are permitted to do. According to the Fund's logic, these defendants, who were not signatories to the relevant collective bargaining agreement or any participation agreement, should not have requested review or demanded arbitration if they believed they were not employers under the MPPAA. If they had not done either, however, one has little doubt the Fund would have nevertheless pursued these defendants vigorously in federal court for the liability assessed in the notice. Thus, regardless of the path taken by defendants, the parties would end up in the same place, disputing the matter here in court. It makes little sense to penalize defendants for taking steps to protect their potential rights that could arguably prevent litigation.

This case highlights the necessity and propriety of affording defendants the right to have their employer status resolved in federal court. It is pointed out that the Fund, in its letters to defendants, mentioned neither the phrase "common control" nor the phrase "alter ego," both principles central to their causes of action here. It merely claimed that both defendants were responsible for the withdrawal liability because they were "affiliated" with Howard's, with no analysis or support for such claim whatsoever. Defendants, for their part, inferred from the letter's cryptic use of "affiliated" that the Fund was claiming they were part of a commonly controlled group that included Howard's. This claim, discussed *infra*, appears to be asserted here virtually devoid of evidentiary support. When defendants in their submissions repeated all the facts from their September 2003 request for review, the Fund responded with either denials without record citation, or denials for want of information. Such responses make arguable that the Fund has skirted the line between having a good faith basis for asserting the *first* cause of action and simply pulling it out of thin air. The principles enunciated in the case law directly anticipate such a situation.

Were it otherwise, the Fund could send a withdrawal liability notice to any company in the United States, no matter the merit, and the company would have no defense to making interim withdrawal liability payments, no matter the amount. Under such a view, a maliciously motivated Fund could systematically bankrupt entire groups of companies, on no other basis than, for example, a history of not hiring union workers. That the truly innocent company could later recoup any monies deemed to be improperly paid does nothing to repair the potentially ruinous damage caused by making the interim payments. Such a state of affairs is unacceptable and, as noted, inconsistent with the case law. This court has jurisdiction to determine whether defendants were ever employers subject to the MPPAA.

This conclusion is reached despite defendants' attorneys, the efforts of whom can only kindly be characterized as "asleep at the switch." First, they failed to advise their clients, once in receipt of the withdrawal liability notices from the Fund sponsor, to initiate a declaratory judgment action, the procedural path explicitly and consistently identified by the case law for companies in their position. *See Levy Bros.*, 846 F.2d at 887; *Progressive Driver*, 940 F.Supp. at 1314 (citing *Rheem*, 63 F.3d at 705–06; *Banner Indus.*, 875 F.2d at 1293–94; *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d

118, 128–29 (3d Cir.1986)). Second, despite having over six months since defendants received the notices from the Fund sponsor, and another month and a half after the complaint was filed, to discover the above clearly expressed principles of law, defense counsel urged in a motion for a preliminary injunction that the Fund's collection efforts be stayed so that the issues of whether defendants were under common control with or alter egos of Howard's could be submitted to and decided by an arbitrator.[7] Third, after the Fund practically invited the discovery of said principles by filing a motion for summary judgment (over a month after the preliminary injunction motion was filed, nearly three months after the complaint was filed, and roughly seven and a half months after the notices were received), defense counsel inexplicably filed an arbitration demand, asking for a finding that defendants were not obligated to pay the withdrawal liability. Assuming that such demand was filed in order to protect potential arbitration rights, and perhaps even avoid litigation, would soften the blow of this last gaffe were it not so clear that the issues identified therein could be resolved in this forum, and the demand itself not so flagrantly late.

Presumably after finally discovering the water in the glass of water, so to speak, defense counsel filed a cross-motion for summary judgment, arguing that whether they were under common control with or the alter egos of Howard's (i.e., whether they were "employers" even subject to the MPPAA in the first place) are proper issues for this forum.

The Fund, for its part, chose to ignore this last motion as inconsistent, and reiterate its position that all issues (aside from ordering interim payments, of course) had to be relegated to an arbitrator. However, it is noted that the Fund, not in its moving papers and not at oral argument, has never claimed that defendants had "consented" to have all issues decided by arbitration. In any event, neither defense counsel's lack of due diligence nor the Fund's acceptance of a late arbitration demand operate to divest this court of its duty to decide, independently, whether defendants were ever "employers" within the meaning of the MPPAA.

## B. Merits of Fund's Claims

By cross-moving for summary judgment, and permitting defendants to do the same, the Fund has placed in issue the entire merits of its causes of action, including the "employer status" issue. Because the Fund's arguments and submissions are entirely based upon its belief that whether defendants were under common control with or alter egos of Howard's are issues reserved exclusively for arbitration, however, it has submitted little regarding the actual merits of the "employer status" issue. Defendants, on the other hand, have submitted a statement of material facts in support of their motion for summary judgment that is replete with factual allegations relevant to the merits of the "employer status" issue.

### 1. First Cause of Action—Common Control

In its *first* cause of action, the Fund contends that defendants are responsible for Howard's withdrawal liability because they were under common control with Howard's. "[A]ll businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d

---

7. *See* Docket No. 9, pp. 2, 7, 15.

82, 86 (2d Cir.1997); 29 U.S.C. § 1301(b)(1). Whether businesses are under common control is resolved by reference to Treasury regulations adopted under Section 414 of the Internal Revenue Code. 29 U.S.C. § 1301(b)(1); 26 C.F.R. §§ 1.414(c)–1 to (c)–5. The regulations provide three different groups the members of which are considered to be under common control and therefore responsible for each other's withdrawal liability.

The *first* is a "parent-subsidiary group" consisting of "one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization." 26 C.F.R. § 1.414(c)–2(b). The *second* is a "brother-sister group" consisting of "two or more organizations conducting trades or businesses if (i) the same five or fewer persons ... own ... a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization." *Id.* § 1.414(c)–2(c).[8] The district court in *ESI Group* adequately outlined the definitions of "controlling interest" and "effective control," as set forth in the regulations:

> A "controlling interest" is defined as ownership of stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote of [a company], or at least 80% of the total value of shares of all classes of stock in [a company]. "Effective control" is defined as ownership of 'stock possessing more than 50% of the total combined

voting power of all classes of stock' entitled to vote or more than 50% of the total value of shares of all classes of stock of [a company].

*ESI Group, supra,* at *6 (citations omitted).

Relevant to these principles, in their requests for review, and again in their moving papers, defendants set forth these different tests, as well as the stock ownership and control histories of both Express and S & P, complete with charts. Per this information, even excluding any later transactions whereby stock was transferred to a family member or redeemed by a company, it is claimed that: (1) Philip Boncaro, Sr. and Samuel G. Boncaro, Jr. each owns a 50% interest in the voting shares of Howard's, a 44.8% interest in the non-voting shares of Howard's, a 20% interest in Express, and a 0% interest in S & P; (2) Philip Boncaro, Jr. and Samuel G. Boncaro, III each owns a 0% interest in the voting shares of Howard's, a 1.7% interest in the non-voting shares of Howard's, a 20% interest in Express, and a 50% interest in S & P; and (3) Edward Haddad owns a 0% interest in the voting shares of Howard's, a 0% interest in the non-voting shares of Howard's, a 20% interest in Express, and a 0% interest in S & P. (Docket No. 20, Statement of Material Facts, ¶¶ 5, 6, 15, 18, 19, 20) ("Material Facts at ¶ ___.") In other words, according to defendants, no group of two or more individuals had or have a controlling interest in or effective control of all three businesses, or either business plus Howard's. In response, the fund "lacks information

---

8. The *third* is a "combined group" consisting of "any group of three or more organizations", if (1) each such organization is a member of either a parent-subsidiary group ... or a brother-sister group ..., and (2) at least one such organization is the common parent organization of a parent-subsidiary group ... and is also a member of a brother-sister group.... *Id.* § 1.414(c)–2(d). Because as a matter of law the Fund has failed to create a factual question with regards to any facet of the other two groups, this group need not be discussed.

sufficient to form a belief as to the truth of the allegations . . . and therefore DENIES same." (Docket No. 32, Response to Defendants' Statement of Material Facts, ¶¶ 5, 6, 15, 18, 19, 20) ("Response at ¶ ___.")

Such naked denials do not suffice to carry the Fund's burden to raise a triable issue of fact, and the lack of record citations accompanying such denials permits defendants' allegations to be deemed admitted under Local Rule 7.1(a)(3). The Fund was on notice of these allegations as early as September 5, 2003, when they were asserted in the requests for review, and certainly by December 19, 2003, upon receiving defendants' motion for a preliminary injunction. It still chose, on January 27, 2004, over four months after receiving the requests for review and over a month after defendants filed their motion for a preliminary injunction, in the absence of any discovery on the issues, to file a cross-motion for summary judgment. In such motion, and in its opposition to defendants' motions, the Fund did not ask for discovery in the event the court determined that it would decide whether defendants were ever employers under the MPPAA, or any other alternative relief. The Fund alone reaps the consequences for taking the chance that the issues herein would be sent to an arbitrator. Defendants will not penalized for moving for the same summary judgment relief as the Fund, with citations to the record.

Accordingly, on the summary judgment submissions, the Fund has failed to raise a genuine issue of material fact and defendants are entitled to judgment as a matter of law on the *first* cause of action.

### 2. *Second Cause of Action—Alter Ego*

■ In its *second* cause of action, the Fund alleges that defendants are responsible for the withdrawal liability as alter egos of Howard's. Initially, it should be pointed out that the Fund now attempts to label this cause of action as one alleging that Howard's attempted to "evade or avoid" its obligation to contribute to the fund through various interactions and transactions with defendants, an inquiry some courts have held is factual in nature and reserved for arbitration. *See Canny, supra.* However, aside from the phrase, or even the words individually, appearing nowhere in the *second* cause of action in the complaint, such a claim is more properly against Howard's, an admitted "employer" and nonparty, and not defendants. If Howard's were a party, the claim would surely be reserved for arbitration because there is no question that Howard's was once an employer obligated to contribute to the fund. To the extent the Fund is claiming that defendants (not Howard's) engaged in transactions to avoid their ERISA obligations, suffice it to say that such transactions were already taken out of the common control equation in the factual allegations relating to ownership and control outlined above. *See supra.* In other words, it is doubtful any transaction was executed to escape an obligation that clearly did not exist at the time.

■ The oddity of asserting an alter ego claim against defendants is further highlighted by the principles of law commonly associated with such a claim under ERISA. Ordinarily, an alter ego claim arises in such a context where two companies are not concurrently performing the same functions, and one of the companies is instead *"replac[ing]"* the other. *See Newspaper Guild of N.Y. Local No. 3 v. NLRB,* 261 F.3d 291, 303 (2d Cir.2001) (quotations and citation omitted) (emphasis in original). To prevail under the alter ego doctrine, the Fund must demonstrate "the existence of a disguised continuance or an attempt to avoid the obligations of a

[collective bargaining agreement] through a sham transaction or technical change in operations." *Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 748 (2d Cir.1996); *Local One, Amalgamated Lithographers v. Stearns & Beale, Inc.,* 812 F.2d 763, 772 (2d Cir.1987). Relevant are whether the companies in question have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions,* 80 F.3d at 748. If it is demonstrated that two companies are, in fact, alter egos of one another, "then each is bound by the collective bargaining agreements signed by the other," including any obligation therein to make contributions to a fund. *Id.*

In the complaint, as support that defendants are alter egos of Howard's, the Fund alleges that: (1) Howard's and defendants intermingled their business operations; (2) the same individuals "were involved in the day to day affairs" of all three companies; and (3) Howard's and defendants did not observe corporate formalities in their business operations. (Docket No. 1, ¶¶ 34–36.) Even if it is assumed that such allegations, devoid even of distinguishing between defendants or naming individuals, do state a cause of action for alter ego, the summary judgment submissions make clear that defendants are entitled to judgment as a matter of law.

The Fund purports to supplement these allegations with eighteen others in its latest memorandum of law. All eighteen, however, are either unpersuasive when placed in proper context or explained, sufficiently rebutted by factual allegations which the Fund denies either without citation or for lack of sufficient information, or

insufficient alone to create a triable issue of fact.

*First,* the Fund cites a motion to compensate insiders, filed by Howard's in its bankruptcy proceedings, for the proposition that "the principles [sic] of Howard's asserted that they have 'complete or substantial' control over Express and S & P." (Docket No. 32, Attach. 1, p. 14.) In the motion, Howard's does claim that it "regularly transacts business with three entities in which insiders have complete or substantial control." (Docket No. 16, Ex. I, ¶ 11.) The motion does nothing to identify to whom "insiders" refers, but, even assuming it applies only to the Howard's principals, the only entity to which "complete" control apparently applies is defendant Doren Avenue Associates, LLC, the ownership interest of which is entirely in the hands of the Howard's principals. *Id.*

Further, although the motion apparently contends that the Howard's principals have "substantial control" over Express because of their combined 40% interest in the company's voting shares, it is also pointed out that "the other three owners can combine to impose control of Express," and that "Express is a freight broker that operates independently under separate management at a separate location." *Id.* at ¶ 12. With respect to S & P, the motion makes no mention of any ownership interest the Howard's principals have, or that they otherwise have any control over the company. *Id.* at ¶ 13. In any event, the Fund denies without citation defendants' allegation that "[n]either Philip J. Boncaro, Sr. nor Samuel G. Boncaro, Jr. has had any involvement whatsoever in the management of [Express and/or S & P]." (Material Facts at ¶¶ 8, 16; Response at ¶¶ 8, 16.) [9]

---

9. Affidavit support for defendants' allegation can be found at Docket No. 20, Attach. 2, ¶¶ 6, 9; *id.,* Attach. 3, ¶¶ 5, 7; *id.,* Attach. 4, ¶¶ 7, 13; *id.,* Attach. 5, ¶¶ 7, 9; *id.,* Attach. 7, ¶ 10; Docket No. 10; Ex. F, ¶ 7; *id.,* Ex. G, ¶ 7. The Fund has submitted no contrary affidavits or other evidence rebutting the allegation.

*Second,* the Fund alleges that, at another bankruptcy-related hearing, Howard's principal Samuel Boncaro, Jr. "testified that Howard's would make weekly payments to S & P without invoices in order to 'keep S & P going.'" (Docket No. 32, Attach. 1, p. 14.) The absence of a submitted transcript or the relevant portion thereof makes impossible the task of determining if such testimony was given and in what context. In addition, defendants have averred that any payments from Howard's to S & P prior to the filing of the bankruptcy petition were for services rendered, a factual allegation the Fund denies without citation to the record. (Material Facts at ¶ 38; Response at ¶ 38.) [10] Payments after the bankruptcy petition was filed were made to S & P and six other cartage agents at the recommendation of a separately hired appraisal company, in response to the agents' fears that they would not be paid for their delivery services in light of Howard's financial problems. (Docket No. 20, Attach. 6, ¶¶ 10–11.)

The motion to compensate insiders, cited above by the Fund, supports this as well. In the motion, it is alleged that S & P is operated entirely by the children of the Howard's principals, has a cartage agent agreement with Howard's that is "identical to [Howard's] agreements with other cartage companies," and "is held to the same level of performance [by Howard's] as other cartage companies." (Docket No. 16, Ex. I, ¶ 13.)

*Third,* the Fund alleges that "[t]he financial records show that S & P was not operated as its own separate business since the sole revenue generated by S & P was paid by Howard's as its alter ego."

(Docket No. 32, Attach. 1, p. 14.) However, the Fund denies without citation the allegations that S & P was only "one of several cartage agents for Howard's ... within eastern Pennsylvania," and that it "received no preferential treatment over any of the other cartage agents." (Material Facts at ¶¶ 13–14, 36–37; Response at ¶¶ 13–14, 36–37.) [11] These allegations are also corroborated by the same motion to compensate insiders cited by the Fund. (Docket No. 16, Ex. I, ¶ 13.)

Further, defendants admit that Howard's was S & P's first customer, and that the latter relied heavily upon the former in its infancy. Subsequently, however, defendants contend that S & P expanded to develop "at least 10 to 20 other customers." (Docket No. 20, Attach. 7, ¶ 11.) The Fund has submitted no affidavits or other materials to contradict these allegations.

*Fourth,* the Fund claims that Howard's filed a bankruptcy motion seeking approval for the sale of its assets, part of which included "a specific provision for the sale of both Doren and Express." (Docket No. 32, Attach. 1, p. 14.) However, as noted, defendant Doren Avenue Associates, LLC was owned entirely by the Howard's principals, and making Express's assets part of the same transaction was suggested by Nick Ferreri, the independent consultant hired to advise Howard's during bankruptcy, as a more favorable way for the buyer to supplement the purchase of Howard's, which did not engage in the same type of business as Express. (Docket No. 20, Attach. 4, ¶ 14; *id.,* Attach. 5, ¶ 11.) The Fund has submitted no contrary affidavits

---

10. Affidavit support for this allegation can be found at Docket No. 20, Attach. 6, ¶ 9. The Fund has submitted no contrary affidavits or other evidence rebutting the allegation.

11. Affidavit support for this allegation can be found at Docket No. 20, Attach. 2, ¶ 12; *id.,* Attach. 3, ¶ 9; *id.,* Attach. 5, ¶ 9; Docket No. 10, Ex. G, ¶ 5. The Fund has submitted no contrary affidavits or other evidence rebutting the allegation.

or other evidence rebutting these allegations.

*Fifth,* the Fund claims that Samuel Boncaro, III, who lives in Geneva, New York, the same town in which Howard's was located, claims to be the president and general manager of S & P, which is located in Pennsylvania, and general manager of Express, which is located in another New York city. (Docket No. 32, Attach. 1, pp. 14–15.) In the motion to compensate insiders, the Fund argues, Howard's verified that he was actually one of its employees. *Id.* at 15. Even assuming that an individual cannot or is not permitted to assume managerial functions from another geographic location, this allegation holds little weight and is arguably contradicted by other evidence in the record. For example, the motion to compensate insiders says only that "[c]hildren of S. Boncaro and P. Boncaro were *heretofore* employed by [Howard's]." (Docket No. 16, Ex. I, ¶ 13) (emphasis added). The motion offers no date on which Samuel Boncaro, III or Philip Boncaro, Jr. ceased to be employees of Howard's. However, defendants have submitted unopposed affidavits stating that both ceased employment with Howard's in the fall of 2002, at the insistence of Ferreri, the independent business consultant. (Docket No. 20, Attach. 2, ¶ 8; *id.,* Attach. 5, ¶ 10.)

*Sixth, seventh, eighth, twelfth,* and *thirteenth,* the Fund claims that S & P and Express, in their certificates of organization and operating agreements, list as their principal place of business Howard's address, as their phone number that of Howard's, and as their agent for service Howard's. (Docket No. 32, Attach. 1, pp. 15–16.)[12] However, defendants have alleged that both Express and S & P have principal places of business with addresses in Romulus, New York, and Allentown, Pennsylvania, respectively, allegations that the Fund denies without record citation. (Material Facts at ¶¶ 2, 11; Response at ¶¶ 2, 11). Such an allegation—that despite the listings in the organizational documents, in actuality both companies operated out of their own offices—is corroborated by affidavits submitted by defendants, (Docket No. 10, Ex. F, ¶ 2; *id.,* Ex. G, ¶ 2), and is explained by Howard's permitting both businesses to accept mail at its address for "no more than six months" because both Samuel Boncaro, Ill's and Philip Boncaro, Jr.'s personal residences were in the same city, and Express and S & P had yet to open their new offices in Romulus and Allentown, (Docket No. 20, Attach. 2, ¶ 13; *id.,* Attach. 5, ¶ 10; *id.,* Attach. 7, ¶ 9; *id.,* Attach. 3, ¶ 10; *id.,* Attach. 4, ¶ 10.) Moreover, defendants allege, and the Fund denies for lack of information, that S & P's and Express's accountant dealt exclusively with Samuel Boncaro, III on Express business at the company's Romulus office, and neither saw the Howard's principals at said office nor discussed any Express-related business with them. (Material Facts at ¶ 43; Response at ¶ 43.)[13]

*Ninth* and *tenth,* the Fund claims that S & P's operating agreement provided Howard's with a priority right to any of S & P's liquidation proceeds, and a right to first refusal if either Samuel Boncaro, III or Philip Boncaro, Jr. attempted to sell or transfer their interests in the company. (Docket No. 32, Attach. 1, p. 15.) However, the Fund does not allege that Howard's would not have to pay for any interest either S & P owner attempted to sell or

---

12. *See also* Docket No. 10, Ex. F, Attach. 2, § 2.3; *id.,* Ex. G, Attach. 2, § 1.3.

13. The allegation in the accountant's affidavit can be found at Docket No. 20, Attach. 7, ¶ 7. The Fund has submitted no contrary affidavit or other evidence rebutting this allegation.

transfer, and it is arguably reasonable that the owners would want to keep the business in their family in the event they could not run it successfully. In any event, even if these factual allegations are accepted as true, they cannot establish, as a matter of law, in the face of virtually no other evidentiary support, that S & P was an alter ego of Howard's.

*Eleventh* and *fifteenth*, the Fund claims that both S & P's and Express's operating agreement provided a non-compete clause whereby its members could not compete against the company unless they were acting on behalf of Howard's. (Docket No. 32, Attach. 1, p. 15.) At the time such documents were executed, however, both Philip Boncaro, Jr. and Samuel Boncaro, III were both working for Howard's. In other words, the exception for Howard's employees was necessary so that the operating agreements would not be violated at the outset.

*Fourteenth, sixteenth,* and *seventeenth,* the Fund claims that certain Express-related documents refer to Samuel Boncaro, Jr. as the company's general manager, Tax Matter Partner, and as having an irrevocable power of attorney. (Docket No. 32, Attach. 1, p. 16; Docket No. 10, Ex. F, Attach. 2, § 5.1.) However, defendants have submitted affidavits alleging that Samuel Boncaro, III, sometimes referred to as "Sam Jr.," was the individual actually referenced in the documents, and that it was he who actually executed the documents and performed the general manager's duties, not his father, who was not involved in the business at all. (Docket No. 20, Attach. 4, ¶ 9.) The Fund has submitted nothing to rebut this allegation.

*Eighteenth,* the Fund claims that certain stock transfers post-dating the withdrawal liability notices "were part of an overall scheme by the Boncaro family to evade or avoid withdrawal liability under 29 U.S.C. § 1392(c)." (Docket No. 32, Attach. 1, p. 16.) As noted, *supra,* however, these transactions were virtually meaningless in light of the fact that, even without them, neither Express nor S & P had any obligation to contribute to the fund, and arguably reasonable if, as defendants claim and the Fund denies for want of sufficient information, such transactions were undertaken at the advice of an independent consultant.

In addition to the above, defendants have asserted several other factual allegations which the Fund either denies without citation to the record, or denies for lack of sufficient information. Among the allegations are: (1) that only a small fraction of Express's business came from Howard's, (Material Facts at ¶ 33; Response at ¶ 33);[14] (2) that Express and Howard's were engaged in different lines of business, (Material Facts at ¶ 30; Response at ¶ 30);[15] (3) that neither Express nor S & P ever intermingled funds with Howard's, (Material Facts at ¶ 40; Response at ¶ 40);[16] and (4) that both Express and S & P were operated, managed, and run by Samuel Boncaro, III, and Philip Boncaro, Jr., (Material Facts at ¶¶ 29, 34; Response at ¶¶ 29, 34.)

---

**14.** Affidavit support for this allegation can be found at Docket No. 20, Attach. 2, ¶ 7; *id.,* Attach. 3, ¶ 6; *id.,* Attach. 5, ¶ 8; *id.,* Attach. 6, ¶ 8. The Fund has submitted no contrary affidavits or other evidence rebutting the allegation.

**15.** Affidavit support for this allegation can be found at Docket No. 20, Attach. 4, ¶¶ 4–5; *id.,* Attach. 2, ¶ 5; *id.,* Attach. 5, ¶ 8. The Fund has submitted no contrary affidavits or other evidence rebutting the allegation.

**16.** Affidavit support for this allegation can be found at Docket No. 20, Attach. 5, ¶ 6. The Fund has submitted no contrary affidavit or other evidence rebutting this allegation.

In sum, in light of the materials submitted by defendants that must be considered at the summary judgment in which the Fund chose to place this litigation, and the Fund's failure to rebut such materials or otherwise raise a genuine, triable issue of material fact with respect to its alter ego claims, defendants are entitled to judgment as a matter of law on the *second* cause of action.

### 3. *Arbitration*

 Because on the summary judgment submissions Express and S & P are not, as a matter of law, under common control with or the alter egos of Howard's, neither is an "employer" within the meaning of the MPPAA. Because they are not "employers" within the meaning of the MPPAA, they are subject neither to its pay now, dispute later mechanism, nor to its arbitration provisions. Thus, the arbitration proceedings initiated by defendants must be terminated.

## IV. CONCLUSION

Whether defendants were ever under common control with or alter egos of Howard's are issues properly decided by a federal court. As both parties moved for summary judgment in the absence of any discovery, the complete merits of the Fund's claims were put directly in issue. Even though most of defendants factual allegations emanate from affidavits of individuals tied in some way to Howard's, Express, and/or S & P, such affidavits are competent Rule 56 evidence, and the Fund has failed to create a triable issue of fact with respect to the statements contained therein. Defendants are not, and were never, employers subject to the MPPAA. Defendants are not, and were never, liable for any pension payments to the Fund. The complaint must be dismissed against the moving defendants.

Accordingly, it is

ORDERED that

1. The Fund's motion for entry of a default judgment against defendant Doren Avenue Associates, Inc., is GRANTED;

2. The Fund's motion for summary judgment against defendants Express Services, LLC, and S & P Trucking, LLC, is DENIED;

3. Defendants', Express Services, LLC, and S & P Trucking, LLC, motion for summary judgment is GRANTED, and the Fund's complaint is DISMISSED against them in its entirety;

4. Defendants', Express Services, LLC, and S & P Trucking, LLC, motion for a preliminary injunction is DENIED as moot; and

5. The arbitration proceedings initiated by defendants on January 29, 2004, are TERMINATED.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.