# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2604

NESTLE HOLDINGS, INC. and
NESTLE TRANSPORTATION COMPANY,

*Plaintiffs-Appellants,*

*v.*

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 5081—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED APRIL 3, 2003—DECIDED SEPTEMBER 5, 2003

———————

Before CUDAHY, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Nestle Holdings, Inc. and Nestle Transportation Company brought a motion to modify and partially vacate an arbitration award entered against it in favor of Central States, Southeast and Southwest Areas Pension Fund, stemming from the company's alleged failure to make required contributions to the Fund. The district court held that the company transferred union work to non-union employees and therefore incurred partial withdrawal liability under the Multi-Employer Pension Plan Amendment Act. Nestle appeals and we affirm.

## I.

Nestle S.A., though its subsidiaries Nestle Holdings, Inc. and Nestle Transportation Company (collectively "Nestle"), transports its products throughout the country via a vast transportation network. That network is composed of independent common carrier truckers, owner-operator drivers and employee drivers. In mid-1995 Nestle utilized approximately 275 owner-operator drivers to transport goods. All of these drivers were independent contractors. In addition, it employed approximately 215 drivers, some of whom were represented by various local unions (also referred to as Fund drivers). Of the drivers relevant to this case, eight of the employee drivers were represented by Teamsters Local Union No. 460, and worked out of the Nestle shipping terminal in St. Joseph, Missouri, and three of the employee drivers were represented by Teamsters Local Union No. 695, and worked out of the Nestle terminal in Oconomowoc, Wisconsin. The collective bargaining agreements (CBAs) with both local unions required Nestle to make contributions to a multi-employer pension plan, the Central States, Southeast and Southwest Areas Pension Fund (the "Fund").

The Nestle transportation network was split into local lanes and over-the-road lanes. Three of the St. Joseph terminal Fund drivers drove local lanes as did one of the Oconomowoc drivers. These local lanes were in practice operated exclusively by the Fund drivers, although the CBAs in effect at either terminal did not specifically describe the work required of the union members. The over-the-road lanes were routes over which trucks would transport Nestle products between two or more geographic locations. The other seven Fund drivers drove over-the-road lanes, along with non-union employee drivers (or non-Fund employee

drivers), owner-operator drivers and common carriers. All classes of drivers drove over-the-road lanes on an essentially randomly selected basis depending on factors such as the availability or location of the driver or his hours driven under government regulations. In the fall of 1995, Nestle reached an agreement with the local unions to close the two trucking terminals in Oconomowoc and St. Joseph for business reasons. The Fund drivers at those locations were let go, even though Nestle's need for truckers who were located near those terminals did not end entirely. The arbitrator specifically noted that Nestle continued to assign work originating in the St. Joseph area after the closures to at least one non-Fund employee driver who resided in the St. Joseph area, and therefore was near the same location as the terminated Fund drivers.

After the terminal closures, the local runs in St. Joseph and Oconomowoc were performed exclusively by independent common carriers. The over-the-road lanes that originated at those locales, however, were distributed amongst all remaining classes of drivers. Nestle continued to assign the over-the-road trucking lanes in the same manner it had before and using the same criteria of driver availability, driver location, and number of hours driven to determine particular long-distance lane assignments. The only difference is that after the terminal closure, the seven Fund drivers who previously drove the over-the-road lanes were not in the available pool from which a driver would be selected. For example, Nestle's records showed that Fund drivers drove the Oconomowoc to Waverly, Iowa, lane in the second quarter of 1995, but non-Fund employee drivers drove this lane during the first quarter of 1996. Similarly, Fund drivers drove the St. Joseph to DeKalb, Illinois, route in the second quarter of 1995. However, after September 1995, of course, no Fund drivers made these runs. Nevertheless, despite this reduction in the available workforce, the

non-Fund employee drivers did not increase their workload through 1996, primarily because Nestle lost a shipping contract in the region.

After the Fund drivers were terminated, the Fund assessed Nestle almost $1.3 million in Employee Retirement Income Security Act ("ERISA") partial withdrawal liability pursuant to the Multi-Employer Pension Plan Amendment Act ("MPPAA"), 29 U.S.C. § 1385(b)(2)(A)(i). The Fund assessed this fee because it determined that Nestle was still liable for contributions to the Fund on behalf of these drivers because it transferred their work to non-Fund employee drivers. Nestle subsequently submitted a request for review to the Fund, asserting that it did not transfer the Fund drivers' work and therefore was not liable for partial withdrawal liability because the Fund-covered operations out of Oconomowoc and St. Joseph effectively ceased upon the terminals' closings, as evinced by the reduction in workload. Nestle also asserted that the work which was continued from the St. Joseph and Oconomowoc locales was not the same work formerly performed by the Fund drivers. The Fund upheld the withdrawal liability assessment, and Nestle submitted its demand for arbitration in November 1997.[1] On June 1, 2001, the arbitrator issued his opinion,

---

[1]  The Fund notes that on at least two occasions in its communications with the Fund, Nestle stated it had "transferred" work formerly performed by drivers covered by collective bargaining agreements requiring contributions to the Fund. In 1996, for example, Nestle's in-house counsel checked the "yes" box in answer to the question whether the work had been transferred in its Statements of Business Affairs sent to the Fund. However, as the district court correctly noted, these admissions were not the basis of the arbitrator's decision. Nor are the admissions necessarily dispositive of the legal issue of liability. More importantly,
(continued...)

finding that Nestle had effected a partial withdrawal from the plan by transferring work to non-Fund employee drivers. Nestle appealed the decision to the district court which affirmed the arbitrator's decision. *Nestle Holdings Inc. v. Central States, Southeast and Southwest Pension Fund*, 204 F. Supp. 2d 1113 (N.D. Ill. 2002). The district court held that Nestle "transferred" union transportation work to non-Fund drivers when the work was reassigned after closure of the company's transportation terminals, and thus partial withdrawal liability for contributions to a union pension fund was properly imposed upon the company. The district court reasoned that the work was assigned in the same way before and after the closures, and was not essentially different in character. Nestle appeals.

## II.

The question in this case is whether the covered unionized work that Teamster drivers formerly did for Nestle out of St. Joseph and Oconomowoc has been "transferred" within the meaning of ERISA as amended by the MPPAA. *See* 29 U.S.C. § 1385(b)(2)(A)(i). This was the sole provision relied on by the Fund in assessing a partial withdrawal liability on Nestle. The MPPAA requires a company that withdraws from a multi-employer pension plan covered by ERISA to pay "withdrawal liability," which is intended to cover that company's share of the unfunded vested benefits that exist when the company withdraws. 29 U.S.C. §§ 1381, 1385, 1391. Withdrawal liability may be assessed if the employer

---

[1] (...continued)
because we find that Nestle did transfer such work so as to incur liability for other reasons, we need not address the issue on this appeal.

makes a complete withdrawal from an ERISA plan, 29 U.S.C. § 1383, or, as in this case, if there is a partial withdrawal under § 1385.[2] In defining partial withdrawal liability, § 1385(b)(2)(A)(i) states:

> (2)(A) There is a partial cessation of the employer's contribution obligation for the plan year if, during such year—
>
> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement (CBA) of the type for which contributions were previously required[3] or *transfers* such work to another location . . . . (Emphasis added.)

This is a case of first impression as no federal court has before addressed the meaning of "transfers" as used in

---

[2] Even though Nestle terminated all union drivers associated with Locals 460 and 695, this case involves only partial withdrawal liability because Nestle, to this day, still makes contributions to the Fund on behalf of other employees not involved in this appeal.

[3] Both the arbitrator and the district court concluded that there was no question that Nestle did not "continue" to perform work in the jurisdictions of the Local 460 and Local 695 CBAs because Nestle closed the St. Joseph and Oconomowoc terminals and the CBAs defined their jurisdictions as work performed by drivers domiciled at those terminals. This conclusion necessarily implies that any work done on the same lanes as previously used by the Fund drivers occurred from a different location, because terminals which previously defined the location of the work were closed.

§ 1385(b)(2)(A)(i).[4] The basic rule in statutory interpretation is that plain statutory language governs. *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 604 (7th Cir. 1999); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (stating that courts must interpret ERISA strictly, according to the plain meaning of the language actually used in the statute). The verb "transfers" as used in its plain sense means: "to convey [something] from one person, place, or situation to another." Webster's Ninth New Collegiate Dictionary 1253 (1990). The statute uses the phrase "transfers such work to another location" where "such work applies to 'work . . . of the type for which contributions were previously required.' "[5] Therefore, if prior to

---

[4]  The Fund maintains that, contrary to Nestle's representations, this case is neither a case of first impression, nor a dispute regarding the meaning of the word "transfer." Rather, the Fund contends, this case presents a factual dispute that the arbitrator resolved in favor of the Fund. While it is true that the arbitrator did have to make several findings of fact, it is also true those findings were only meaningful in the context of ERISA. The district court appropriately exercised plenary jurisdiction over the meaning of the word "transfer" insofar as ERISA is concerned, and so shall we. *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 804 (7th Cir. 1999).

[5]  Nestle incorrectly argues that "such work" refers to "work in the jurisdiction of the collective bargaining agreement," as defined by the domicile of the affected drivers. However, this phrase in the statute specifically modifies the "continues" portion of the statute. *See* § 1385(b)(2)(A)(i). The phrase "transfer such work to another location" implies that work will not be performed out of the same jurisdiction of the collective bargaining agreement. If the statute were read in accordance with Nestle's contention, then the second clause of the statute would be

(continued...)

the closures union employees were performing work for
which contributions were required, and which was then
conveyed to and performed by non-Fund employee drivers
at another location after the closures, then Nestle would be
liable under the statute.[6]

Nestle argues that, as a matter of law, the company did
not transfer the work of its Fund drivers domiciled at the St.
Joseph and Oconomowoc terminals to its drivers for whom
it owed no contributions to the Fund domiciled elsewhere.
Primarily the company contends that after the closure of the
St. Joseph and Oconomowoc terminals, its non-Fund
employee drivers did the same work they had been doing
before the terminal closures *and less of it.*[7] Nestle argues that

_____

[5] (...continued)
rendered meaningless.

[6] Nestle does not contest the amount, $1,257,598.41, assessed for
partial withdrawal liability.

[7] Those lanes that were assigned to independent owner/
operators and common carriers after the closures are not the
subject of this appeal. A Pension Benefit Guaranty Corporation
("PBGC"), the agency delegated the authority to administer the
MPPAA, Opinion Letter 87-17 (Aug. 13, 1986), Def. Ex. 3, states
that work formerly done by pension fund covered employees but
taken up by third parties is not "transfer[red] . . . to another
location within the meaning of [§ 1385(b)(2)(A)(i)]," because the
law covers situations where "work of the same type is continued
by the employer but for which contributions to a plan . . . are no
longer required." The PBGC understood "work of the same type"
to mean in part work done "at another of its own locations."
Therefore for the transfer of work to another location or em-
ployee to be a precondition to a partial withdrawal, the transfer
must be to other employees and not to any third parties such as
owner/operator drivers or third-party contractors. For example,
(continued...)

because the company did not hire more (replacement) non-Fund employee drivers, and its existing non-Fund employee drivers actually drove *fewer* long distance lanes after the closures than they had before, the company did not transfer any work to non-Fund employee drivers. As both the district court and the arbitrator noted, an essential element to their argument is that the routes previously assigned to union workers, which were unidentifiable prior to the terminal closures, simply disappeared when the terminals were closed.

Nestle's argument, however, fails to convince. Prior to the closures, the work was assigned by Nestle on the basis of efficiency, driver availability, location, and remaining regulated hours of the drivers. Thus, the assignments were not entirely random, but instead predicated on a valuation linked to overall network efficiency. There was no set number or type of route that was performed by Fund drivers; instead drivers were assigned to those routes for which they were most qualified in terms of network efficiency. There-

---

[7] (...continued)
after the closures, the local lanes were no longer driven by Nestle employees; that work was being done by third-party outsiders, and so, under ERISA, it did not create partial withdrawal liability. Both the arbitrator and district court agreed with this argument, and appropriately so. *See Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 210 n. 2 (7th Cir. 1989) ("The PBGC's views are entitled to deference because of its responsibility to enforce Title IV of ERISA, 29 U.S.C. §§ 1301, 1461 (which includes ERISA's withdrawal liability provisions)"); *see also Penn Central Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 534 (9th Cir. 1996) ("We are obligated to defer to the PBGC's interpretation '[e]ven if reasonable minds could differ as to the proper interpretation of the statute.' ") (citation omitted).

fore "such work" as defined by the statute, in this case, means those routes which on the basis of efficiency, availability, location and remaining hours, would have been assigned to a Fund driver. Admittedly this work, along with the overall workload for the non-Fund employee drivers, decreased following the closures. However, it cannot be said that because the "terminals" closed in St. Joseph and Oconomowoc, the work which would have been previously assigned to the Fund employees completely disappeared. It strains credulity to believe that all of the non-Fund employees at both terminals, who were previously determined to be less qualified in terms of network efficiency to handle a certain haul, would immediately become the more efficient alternative after the terminal closures.

This conclusion still holds true even considering that the "location" aspect of the efficiency analysis would have changed after the terminal closures because the Fund drivers would no longer have been domiciled at the terminals. For example, the arbitrator specifically noted that at least one non-union driver who lived in or near St. Joseph, but did not report to the St. Joseph terminal, continued to drive in the lanes previously assigned to union members after the closures. Prior to the closures, the arbitrator noted, this driver shared the out-hauls from St. Joseph and therefore must have been periodically determined to be less appropriate to handle certain loads. After the closures he, along with all of the other non-Fund employee drivers on the routes, would be selected to carry a load even if one of the union members previously domiciled at the St. Joseph or Oconomowoc terminal could have more efficiently handled the work. Therefore, the work that would have previously been handled by a Fund employee was transferred out of the jurisdiction of the terminated CBAs to the non-Fund employee because they were performing work that they would not have been previously assigned.

Nestle cautions the court against misreading the statute to include a clause that would impose partial withdrawal liability on an employer who *continues* work at another location, as opposed to *transfers* work to another location. *See* 29 U.S.C. §1385(b)(2)(A)(i). We are mindful of this caution considering that the non-Fund employees were, in fact, responsible for the same routes as the Fund employees prior to, and after the terminal closures. Additionally, the overall workload of the non-Fund employee drivers did not increase when they assumed complete responsibility for those routes. However, after the closures the non-Fund employees did assume complete responsibility for all of the hauls on the routes, even those hauls which a Fund driver would have more appropriately handled. It was these hauls which were conveyed to the non-Fund employee drivers, and thus work was transferred to another location pursuant to 29 U.S.C. §1385(b)(2)(A)(i). Nestle could have taken several steps to reduce their liability under the statute. When faced with a reduction in overall workload, Nestle could have reduced its workforce across the board, including both Fund and non-Fund employee drivers, instead of targeting only the union-represented drivers. This would have been especially appropriate in this case considering that Nestle could not identify beforehand which particular hauls were handled by Fund and non-Fund employee drivers. Or Nestle could have redefined the Fund drivers' work responsibilities to identify their particular hauls or lanes. For example, because four of the released Fund drivers operated exclusively in local lanes, Nestle avoided partial withdrawal liability upon their termination by contracting with third-party common carriers to drive those lanes. In either scenario, Nestle would not have been assigning non-Fund employees work which would have previously been assigned to Fund employees, thereby incurring liability.

### III.

For the foregoing reasons, we AFFIRM the district court.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*