CENTRA, INC. and Detroit International Bridge Company, Plaintiffs, Counterdefendants,

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant, Counterplaintiff.

No. 07 C 6312.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 30, 2008.

1018

Colin Michael Connor, Mark A. Casciari, Ronald J. Kramer, Seyfarth Shaw LLP, Chicago, IL, Edward R. MacKiewicz, Eric G. Serron, Patrick S. Menasco, Richard K. Willard, Steptoe & Johnson LLP, Washington, DC, for Plaintiffs, Counterdefendants.

James Patrick Condon, Thomas Maurice Weithers, Central States Law Department, Rosemont, IL, Richard Lee Fenton, Frank P. Vanderploeg, Geoffrey J. Repo, Sonnenschein, Nath & Rosenthal, LLP, Chicago, IL, for Defendant, Counterplaintiff.

## OPINION AND ORDER

WILLIAM T. HART, District Judge.

■ Plaintiffs CenTra, Inc. ("CenTra") and Detroit International Bridge Company ("DIBC") filed this action to enforce an arbitration award concerning withdrawal liability under the Multiemployer Pension Plan Amendment Act ("MPPAA"), 29 U.S.C. §§ 1381–1453. Defendant Central States, Southeast and Southwest Areas Pension Fund ("Central States") has counterclaimed to vacate or modify the award, CenTra engaged in a reorganization that involved corporate subsidiaries being merged into CenTra, the subsidiaries' assets and operations being split between CenTra and new corporate subsidiaries, the transfer of the stock of the new subsidiaries to a related corporation, and the related corporation subsequently ending its control group association with CenTra. Central States assessed $14.7 million in withdrawal liability against CenTra based on the withdrawal from the pension fund by DIBC, a control group company that had been retained by CenTra in the reorganization. CenTra disputed the portion of the assessment based on the operations that had been transferred. CenTra paid the assessed amount and, thereafter, CenTra and DIBC appealed to an arbitrator who ruled in their favor that they had no withdrawal liability except that based on DIBC's operations. Pending before this court are plaintiffs' motion to enforce the arbitration award and defendant's motion to vacate or, alternatively, modify the arbitration award.

■ On review before this court the arbitrator's factual determinations are presumed correct and may be overturned only if against the clear preponderance of the evidence. 29 U.S.C. § 1401(c); *Central States v. Nitehawk Express, Inc.,* 223 F.3d 483, 488 (7th Cir.2000). Whether plaintiffs structured the reorganization in a manner that exempts them from withdrawal liabili-

ty is a mixed question that is also subject to clear error review. *Id.*; *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1411 (7th Cir.1989). "A finding is clearly erroneous if the reviewing court, after acknowledging that the factfinder below was closer to the relevant evidence, is firmly convinced that the factfinder erred." *Nitehawk*, 223 F.3d at 488–89. Pure questions of law are reviewed *de novo*. *Central States v. Midwest Motor Express, Inc.*, 181 F.3d 799, 805 (7th Cir.1999). The latter include discrete questions regarding the meaning of statutory terms. *Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999, 1003 (7th Cir. 1993), *aff'd*, 513 U.S. 414, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995); *Zahn*, 890 F.2d at 1411 & n. 12; *Nestle Holdings, Inc. v. Central States*, 204 F.Supp.2d 1113, 1116–17 (N.D.Ill.2002), *aff'd*, 342 F.3d 801 (7th Cir.2003); *National Pension Plan of Unite Here Works Pension Fund v. Westchester Lace & Textiles, Inc.*, 2006 WL 2051107 *4 (S.D.N.Y. July 21, 2006).

There is no significant factual dispute regarding the structure of the reorganization that occurred. CenTra was formed in 1970 as a holding company. As of 1995, Manuel Moroun ("Matty") was the principal owner of CenTra and his three sisters—Agnes Anne Moroun ("Anne"), Florence McBrian, and Victoria Bake—were minority owners. From 1970 until the 1995 reorganization, two of CenTra's fully owned subsidiaries were Central Cartage, Inc. ("Cartage") and Central Transport, Inc. ("Transport").[1] Cartage performed local pick-up and delivery services while Transport engaged in intercity line hauling. The Old Subs both had employees who were represented by the Teamsters and for whom contributions were made to Central States. In 1979, Cartage purchased as a subsidiary DIBC, which owns and operates the Ambassador Bridge which connects Detroit, Michigan to Windsor, Ontario. DIBC also had employees for whom contributions were made to Central States. Transport had the fully owned subsidiary Crown Enterprises ("Crown"), which owns and leases real estate. Crown has never had any Teamster-represented employees. During the relevant time period, DIBC and Crown were highly profitable enterprises.

U.S. Truck Company Inc. ("U.S. Truck") also had Teamster-represented employees for whom contributions were made to Central States. U.S. Truck was not a subsidiary of CenTra, but related to it because it was owned by Anne and Matty had certain rights to purchase some of its stock. Under the MPPAA, CenTra and U.S. Truck were considered to be part of the same control group. *See generally* 29 U.S.C. § 1301(b)(1).

Following deregulation of the trucking industry in the early 1980's, the trucking business of the Old Subs began to lose money. DIBC and Crown, however, remained profitable. In the mid–1980's, plans for the reorganization of CenTra began. Because of disputes between the siblings and other reasons, implementation of the reorganization was delayed until 1995.[2]

---

**1.** Collectively, Cartage and Transport will be referred to as the "Old Subs."

**2.** The purposes of the reorganization are only pertinent if the MPPAA § 4212(c) issue need be reached. *See* 29 U.S.C. § 1392(c) ("If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."). Because the arbitrator committed legal error in determining that the reorganization avoided withdrawal liability for CenTra, the § 4212(c) issue need not be reached and it is unnecessary to detail the purpose or purposes of reorganization. Only the structure of the reorganization need be considered. The minimal description provided in this opinion is not meant to resolve any

Prior to December 31, 1995, two new fully own subsidiaries of CenTra were created: Central Cartage of Michigan, Inc. ("New Cartage") and central Transport of Michigan, Inc. ("New Transport").[3] Effective December 31, 1995, the Old Subs were merged into CenTra and ceased to exist as distinct entities. At the same time (or shortly thereafter), some of the assets of the Old Subs were transferred to the New Subs, All of the operations involving the unionized drivers were transferred to the New Subs. Some, but not all, of the assets associated with these operations were also transferred to the New Subs. CenTra retained related real estate and substantial amounts of the related receivables. CenTra also transferred freight contracts of the Old Subs to a new CenTra subsidiary, Central Transport International, Inc. The profitable, non-trucking subsidiaries of the Old Subs, DIBC and Crown, were not transferred to the New Subs. Under the merger, DIBC and Crown became direct subsidiaries of CenTra and remained so following the reorganization.

On February 29, 1996, the stock of New Transport was sold to U.S. Truck. On August 9, 1996, the stock of New Cartage was sold to U.S. Truck. On August 19, 1996, Matty and Anne entered into an agreement settling certain disputes between them. This included Matty giving up his option to purchase U.S. Truck stock. The parties agree that, absent a possible application of § 4212(c), this settlement agreement resulted in U.S. Truck being removed from the CenTra control group.

U.S. Truck was unable to keep the New Subs (which were stripped down versions of the Old Subs) going for very long. In 1997, U.S. Truck began shutting down some of its operations, including all of New Transport's operations. After some organizational changes, all the operations of New Cartage ceased in late 1999 and reformed U.S. Truck filed for bankruptcy at the same time and was subsequently liquidated. When New Cartage's operations ceased in 1999, U.S. Truck incurred withdrawal liability.

After divesting the New Subs and U.S. Truck, the CenTra control group was still contributing to Central States on behalf of DIBC employees. The labor agreement that required those contributions expired in November 1997. CenTra and DIBC negotiated a new collective bargaining agreement ("CBA") with the local union that provided for employee participation in a different pension plan effective January 1, 1998. The Central States plan, however, had a "split term" provision prohibiting contributions obligations for less than the full term of the applicable CBA. Central States terminated DIBC's participation in Central States effective November 1997 instead of January 1, 1998.[4]

Thereafter, Central States determined CenTra's withdrawal liability based on the contribution histories of the Old and New Subs up through August 1996, as well as DIBC's entire contribution history. The total amount assessed was $14,761,082.66. CenTra contended that any withdrawal liability based on the contributions of the Old and New Subs transferred to U.S. Truck with the sale of the New Subs and, since

disputed issue pertinent to the § 4212(c) issue.

**3.** Collectively, New Cartage and New Transport will be referred to as the "New Subs."

**4.** Before the arbitrator, plaintiffs disputed whether withdrawal liability should be com-

puted based on the November 1997 termination date or January 1998 termination date. The arbitrator ruled in favor of Central States in applying the November date. Before this court, plaintiffs do not dispute that ruling.

U.S. Truck was no longer part of the CenTra control group, CenTra had no withdrawal liability based on the contributions of the Subs. Under the applicable procedures, plaintiffs had to pay the full assessment before filing their arbitration demand. The arbitrator ruled in plaintiffs' favor on the major issue, requiring that Central States refund all but $959,332 representing the withdrawal liability related to DIBC contributions. In a supplemental decision, the arbitrator ruled that plaintiffs were entitled to interest on the refund, but did not make a determination as to how interest should be calculated. The arbitrator denied plaintiffs' request for costs and attorney fees incurred in the arbitration.

In determining that withdrawal liability related to the Subs' contributions passed out of the CenTra control group as a result of the reorganization, the arbitrator primarily relied on MPPAA § 4218(1)(A) which provides:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
>
> > (1) an employer ceases to exist by reason of—
> >
> > > (A) a change in corporate structure described in section 1369(b) of this title, or
> > >
> > > (B) a change to an unincorporated form of business enterprise,
> >
> > if the change causes no interruption in employer contributions or obligations to contribute under the plan, or
> >
> > (2) an employer suspends contributions under the plan during a labor dispute involving its employees.
>
> For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

29 U.S.C. § 1398.

MPPAA § 4069(b), which is referenced in § 4218(1)(A) provides:

> For purposes of this subtitle, the following rules apply in the case of certain corporate reorganizations:
>
> **(1) Change of identity, form, etc.**
>
> > If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.
>
> **(2) Liquidation into parent corporation**
>
> > If a person ceases to exist by reason of liquidation into a parent corporation, the parent corporation shall be treated as the person to whom this subtitle applies.
>
> **(3) Merger, consolidation, or division**
>
> > If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.

29 U.S.C. § 1369(b).

Both parties agree (as was also held by the arbitrator) that, pursuant to these statutes, the Old Subs' merger into CenTra—which was the first step of the reorganization—did not result in a withdrawal and CenTra, as the successor corporation, thereby became the person to whom the Old Subs' contribution obligations and potential withdrawal liability applied. The disagreement is as to the effect of the second step of the reorganization—the transfer of assets to the New Subs—and any related effect of the third step—the sale of the New Subs' stock to U.S. Truck.

The arbitrator ruled that the transfer of assets to the New Subs was a "division" under § 4069(b)(3), holding that a division need not be a sale, transfer, or split of an

entity's stock, but can be a distribution of assets.

... [According to Central States,] [t]he asset drop down (to the New Subs) cannot be considered the type of "division" contemplated by §§ 4218 and 4069. That term, argues the Fund, is commonly understood to mean a "spin-off," "split-up" or "split-off" transaction by which shareholders of a parent corporation receive a distribution of stock of subsidiaries. The term, was intended to be applied in its technical context as utilized in §§ 55 and 368 of the Internal Revenue Code.

However, there is no reference in the ERISA statute that leads to the conclusion that "division" was intended as a term of art designed to conjure up state corporate or federal tax law. It is, as Judge Easterbrook has noted, an "undefined term." But it is by no means a stretch to find it reasonably applicable to the current case, which involved transfer of trucking assets "down" to new entities simultaneous to the merger up.

Arb. Op. 25–26 (citing *Central States v. Sherwin–Williams Co.*, 71 F.3d 1338, 1339 (7th Cir.1995)) (footnotes omitted).

The MPPAA provides no express definition of division, nor has the PBGC issued any regulation defining that term. However, at least two court cases have construed that term, as used in § 4069(c), as referring to transfers of stock. *See Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 805 (2d Cir.1994) (quoting case below, 810 F.Supp. 522, 528 (S.D.N.Y. 1992)) ("While 'division' is not a term of art with a widely established meaning, the district court—relying on the scant legislative history and an opinion letter of the Pension Benefit Guaranty Corporation—concluded that the term, 'as used in the MPPAA, appears to connote a transaction whereby the stock of a contributing corpo-

ration is "divided" away from its controlled group and acquired by or distributed to new owners.' "); *Central States v. Madison Elec. Co. of Ann Arbor*, 1999 WL 999793 *4 (N.D.Ill. Oct. 29, 1999). *See also Teamsters Pension Trust Fund of Philadelphia & Vicinity v. Custom Cartage, Co.*, 1991 WL 160966 *6 (E.D.Pa. Aug. 15, 1991), *aff'd by unpublished order*, 961 F.2d 1568 (3d Cir.1992) (transfer of employees from one member of a control group to another member is not a reorganization falling under § 4218). Moreover, such a construction is consistent with the structure of the MPPAA, which has one provision concerning excepting asset transfers from being withdrawals, MPPAA § 4204, 29 U.S.C. § 1384, and another concerning excepting changes in business form from being withdrawals, MPPAA § 4218. *See Madison Elec.*, 1999 WL 999793 at *4 (quoting *Richland Indus., Ltd. v. Robbins*, 617 F.Supp. 639, 644 (N.D.Ill.1985)). It is clear, and plaintiffs do not contend otherwise, that the asset transfer at step 2 of the reorganization did not satisfy the requirements of § 4204, which applies only to an arm's length sale to an unrelated party and has bonding and secondary liability requirements. *See* 29 U.S.C. § 1384(a)(1). Additionally, § 4218(1) applies to situations where an employer ceases to exist following a division or other change of corporate structure. CenTra continued to exist following step 2, and all other further steps. That is another reason that § 4218 is inapplicable to step 2 or any other occurrence after step 1.

Step 1 of the reorganization placed CenTra in the shoes of the Old Subs, making it directly liable for what formerly was the Old Subs' contribution obligations and placing it in a position to be directly liable for any subsequent withdrawal liability. As previously discussed, no further step satisfied any of the conditions for further

application of § 4218. Therefore, CenTra must rely on some other basis for avoiding any future withdrawal liability. However, § 4218 is the only provision on which it relies. The arbitrator committed legal error in determining that the application of § 4218 following step 1 of the reorganization acted to relieve CenTra of any future withdrawal liability related to the contributions of CenTra's predecessor organizations, the Old Subs. What happened here was a reorganization in which substantial assets of the Old Subs were acquired by CenTra. The Old Subs' stock was not sold in a "division." Rather, the New Subs stock was sold, which represented substantially less value after CenTra retained assets of the Old Subs. This kind of transaction and reorganization does not fall within the statutory language for withdrawal liability exemption. It was error to overturn the assessment.

Since relief is being granted on defendant's primary contention, it is unnecessary to consider its alternative contention that the reorganization had no effect on withdrawal liability because a principal purpose of the reorganization was to evade withdrawal liability.[5] *See* 29 U.S.C. § 1392(c). No opinion is expressed as to whether Central States properly preserved the § 4212(c) issue[6] nor whether the arbitrator's ruling on the merits of that issue was clearly erroneous.

IT IS THEREFORE ORDERED that defendant's motion to vacate the arbitration award [43] is granted and defendant's

alternative motion to modify the arbitration award [43] is denied without prejudice. Plaintiffs' motion to enforce the arbitration award [45] is denied. The Clerk of the Court is directed to enter judgment in favor of defendant-counterplaintiff and against plaintiffs-counterdefendants (a) dismissing plaintiffs' cause of action with prejudice; (b) vacating the October 10, 2007 and February 12, 2008 arbitration awards; and (c) fully reinstating the June 5, 1998 withdrawal liability assessment that defendant made against plaintiffs.

---

**5.** Defendant contends that application of § 4212(c) would result in a higher assessment because it would result in CenTra's withdrawal liability also being based on further contributions made by the New Subs after U.S. Truck left the control group, a contention disputed by plaintiffs. Defendant, however, is willing to forego that possibility if the initial assessment is upheld. Also, it is unknown whether U.S. Truck, before or following the declaration of bankruptcy, paid all or part of

that withdrawal liability which would preclude collecting the amount already paid from CenTra as well, even if there was an additional assessment against CenTra.

**6.** Plaintiffs contend the § 4212(c) issue is waived because not raised in the initial assessment. The arbitrator did not need to rule on the waiver issue because he rejected the § 4212(c) issue on its merits.